# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: October 7, 2026

| | |
|---|---|
| MALLORY JOHNSON, Petitioner, | PUBLISHED |
| v. | No. 21-2288V |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | Special Master Nora Beth Dorsey |
| | Dismissal; Tetanus-Diphtheria-Acellular Pertussis ("Tdap") Vaccine; Guillain-Barré Syndrome ("GBS"). |

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Mary Novakovic, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION[1]

On December 13, 2021, Mallory Johnson ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioner alleges that as a result of receiving a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on December 12, 2018, she developed Guillain-Barré Syndrome ("GBS"). Petition at 1 (ECF No. 1). Respondent argued against compensation, stating that "[P]etitioner is not entitled to an award under the Vaccine Act." Respondent's Report ("Resp. Rept.") at 1 (ECF No. 55).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[3] the undersigned finds that Petitioner failed to provide preponderant evidence that her Tdap vaccine caused her to develop GBS, chronic inflammatory demyelinating polyneuropathy ("CIDP"), or any other injury. Thus, Petitioner has failed to satisfy her burden of proof under Althen v. Secretary of Health & Human Services, 418 F.3d 1274, 1280 (Fed. Cir. 2005). Accordingly, Petitioner is not entitled to compensation.

## I. ISSUES TO BE DECIDED

The parties agree that Petitioner, at 33 years of age, received a Tdap vaccination on December 13, 2018 in the United States. Joint Submission ("Joint Sub."), filed Oct. 6, 2025, at 1 (ECF No. 97). The parties also stipulate that Petitioner had genetic disorders Ehlers-Danlos syndrome ("EDS")[4] and Charcot-Marie-Tooth ("CMT"), specifically CMT Type I A ("CMT1A"),[5] prior to vaccination. Id.; Petitioner's Reply Memorandum in Support of her Motion for Ruling on Record ("Pet. Reply"), filed Oct. 6, 2025, at 4 (ECF No. 98).

Petitioner's diagnosis is in dispute. Joint Sub. at 1. Petitioner alleges her diagnosis is GBS, while Respondent contends the totality of the medical records supports a diagnosis of CIDP and/or CMT. Pet. Motion for a Ruling on the Record ("Pet. Mot."), filed July 3, 2025, at 22, 35 (ECF No. 93); Resp. Response to Pet. Mot. ("Resp. Response"), filed Sept. 2, 2025, at 29-30 (ECF No. 94); Pet. Reply at 2-3.

---

[3] While the undersigned has reviewed all the information filed in this case, only those filings and records that are most relevant will be discussed. See Moriarty v. Sec'y of Health & Hum. Servs., 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); Simanski v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'" (citation omitted)), aff'd, 601 F. App'x 982 (Fed. Cir. 2015); Paterek v. Sec'y of Health & Hum. Servs., 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[4] EDS is a genetic connective tissue disorder. Ehlers-Danlos Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110561 (last visited Sept. 15, 2026). "Prominent manifestations include hyperextensible skin and joints, easy bruisability, and friability of tissues with bleeding and poor wound healing, with additional symptoms specific for individual types." Id.

[5] Although Dr. Tornatore sometimes abbreviates this to CMT1a, the undersigned will use CMT1A throughout for consistency. For an explanation of CMT, see infra Section II.B.1.

The parties also dispute (1) "[t]he nature of [Petitioner's] neurological symptoms prior to vaccination,"[6] (2) "[t]he nature of [Petitioner's] neurological symptoms after vaccination,"[7] and (3) "[w]hether [P]etitioner had an infectious illness in January 2019."[8] Joint Sub. at 1.

Lastly, causation—specifically, all three Althen prongs—is in dispute. Joint Sub. at 2.

## II. BACKGROUND

### A. Procedural History

Petitioner filed her petition on December 13, 2021, followed by medical records and an affidavit from January 2022 to November 2023.[9] Petition; Petitioner's Exhibits ("Pet. Exs.") 1-17. On December 6, 2023, Respondent filed his Rule 4(c) report, arguing against compensation. Resp. Rept. at 1.

On July 31, 2024, Petitioner filed an expert report from Dr. Carlo Tornatore. Pet. Ex. 18. On September 24, 2024, Respondent filed expert reports from Dr. Dara G. Jamieson and Dr. James N. Moy. Resp. Exs. A, C. Petitioner filed a supplemental report from Dr. Tornatore on January 21, 2025 and Respondent filed supplemental reports from Dr. Jamieson and Dr. Moy on March 21, 2025. Pet. Ex. 57; Resp. Exs. E-F.

On May 5, 2025, the parties filed a joint status report indicating that they agreed to a Ruling on the Record. Joint Status Rept., filed May 5, 2025 (ECF No. 86). Thereafter, a briefing schedule was set. Ruling on the Record Order dated May 6, 2025 (ECF No. 87).

Petitioner filed a motion for a ruling on the record on July 3, 2025. Pet. Mot. Respondent filed a response on September 2, 2025, and Petitioner filed a reply on October 6, 2025. Resp. Response; Pet. Reply.

This matter is now ripe for adjudication.

---

[6] This factual dispute is resolved in the undersigned diagnosis and Althen analyses. See infra Sections IV, VI.

[7] This factual dispute is resolved in the undersigned's diagnosis and Althen analyses. See infra Sections IV, VI.

[8] This factual dispute is resolved in the undersigned's Althen prong two analysis. See infra Section VI.B.

[9] Medical records were filed throughout litigation.

## B. Medical Terminology

### 1. Charcot-Marie-Tooth

"CMT is the most common hereditary neuromuscular disorder." Pet. Ex. 20 at 1;[10] see also Resp. Ex. A-2 at 1.[11] CMT is subdivided into demyelinating (CMT1) and axonal types (CMT Type 2 ("CMT2")). Pet. Ex. 20 at 2; Pet. Ex. 27 at 1;[12] Resp. Ex. A-1 at 2.[13] CMT is a gradually progressive disease that usually begins in the first two decades of life and subsequently progresses over the decades. Pet. Ex. 20 at 1, 8; Pet. Ex. 21 at 1;[14] Resp. Ex. A-1 at 2. "Symptoms and signs indicative of CMT include . . . difficulty in running; twisting of the ankle and tripping; difficulty in walking; foot drop; steppage gait; wasting, weakness, and sensory loss of distal segments of lower and then upper limbs; difficulties in hand manipulation; and reduced or absent deep-tendon reflexes." Pet. Ex. 20 at 1. Patients with CMT can also have fatigue, muscle cramps, hand tremors, foot callosities, skeletal deformities, reduced or absent deep tendon reflexes, sensory symptoms (paraesthesias), and pain in feet, lower extremities, and lumbar spine. Id. at 1-2; Resp. Ex. A-2 at 6-7.

CMT1A is the most common form of CMT and is caused by a gene mutation, specifically a duplication of the peripheral myelin protein 22 ("PMP22") gene. Pet. Ex. 20 at 1-2, 8; Pet. Ex. 21 at 2; Pet. Ex. 27 at 1; Resp. Ex. A-2 at 2. Typically, the first signs of CMT1A are areflexia in the lower extremities, wasting and weakness of intrinsic foot muscles and later peroneal and anterior tibialis muscles, and subtle hand involvement. Pet. Ex. 20 at 8; Resp. Ex. A-2 at 2. Motor symptoms begin at the feet (e.g., high arches, hammer toes, and intrinsic muscle weakness and wasting), then move up the leg to the thigh, producing distal atrophy of the lower extremities, at which time, the hands and arms are also typically affected. Pet. Ex. 20 at 1. Sensory loss also begins in the feet and hands, commonly depicted by decreased sensation of vibration, touch, and pain. Id.

---

[10] Davide Pareyson & Chiara Marchesi, Diagnosis, Natural History, and Management of Charcot-Marie-Tooth Disease, 8 Lancet Neurol. 654 (2009).

[11] Chiara Pisciotta & Michael E. Shy, Hereditary Neuropathy, in 195 Handbook of Clinical Neurology 609 (D.S. Younger ed., 2023).

[12] A. Desurkar et al., Charcot-Marie-Tooth (CMT) Disease 1A with Superimposed Inflammatory Polyneuropathy in Children, 40 Neuropediatrics 85 (2009).

[13] Thomas D. Bird, Charcot-Marie-Tooth Hereditary Neuropathy Overview, in GeneReviews (Margaret P. Adam et al. eds.), https://www.ncbi.nlm.nih.gov/books/NBK1116/?report=reader (last revised Aug. 1, 2024).

[14] Lionel Ginsberg et al., Coexistent Hereditary and Inflammatory Neuropathy, 127 Brain 193 (2004).

Patients with CMT may be misdiagnosed with CIDP as both conditions present with similar clinical and electrophysiological features. Pet. Ex. 20 at 9; Resp. Ex. A-1 at 6; Resp. Ex. A-21 at 1, 6;[15] Resp. Ex. A-23 at 1;[16] Resp. Ex. A-25 at 2.[17]

### 2. Guillain-Barré Syndrome and Chronic Inflammatory Demyelinating Polyneuropathy

GBS is a "rapidly progressive ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection." Guillain-Barré Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110689 (last visited Sept. 15, 2026). GBS typically "begins with paresthesias of the feet, followed by flaccid paralysis of the entire lower limbs, ascending to the trunk, upper limbs, and face; other characteristics include slight fever, bulbar palsy, absent or lessened tendon reflexes, and increased protein in the cerebrospinal fluid [("CSF")] without a corresponding increase in cells." Id.; see also Resp. Ex. A-5 at 2;[18] Resp. Ex. A-7 at 2-3.[19] The most common subtype of GBS acute inflammatory demyelinating polyneuropathy ("AIDP"), "which has the pathologic and electrodiagnostic features of focal demyelination of motor and sensory peripheral nerves and nerve roots." 42 C.F.R. § 100.3(c)(15)(ii); see also Resp. Ex. A-3 at 1;[20] Resp. Ex. A-5 at 2.

The Vaccine Injury Table list exclusionary criteria for the diagnosis of GBS, which includes the diagnosis of CIDP. 42 C.F.R. § 100.3(c)(15)(vi). CIDP, which "is related to [GBS]," is "a slowly progressive, autoimmune type of demyelinating polyneuropathy characterized by progressive weakness and impaired sensory function in the limbs and enlargement of the peripheral nerves, usually with elevated protein in the [CSF]." Chronic Inflammatory Demyelinating Polyneuropathy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=99346 (last visited Sept. 15, 2026).

---

[15] Marta Campagnolo et al., Sporadic Hereditary Neuropathies Misdiagnosed as Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Pitfalls and Red Flags, 25 J. Peripher. Nerv. Sys. 19 (2020).

[16] Miguel A. Fernandez-Garcia et al., Genetic Neuropathies Presenting with CIDP-Like Features in Childhood, 31 Neuromuscul. Disord. 113 (2021).

[17] Fabien Hauw et al., Charcot-Marie-Tooth Disease Misdiagnosed as Chronic Inflammatory Demyelinating Polyradiculoneuropathy: An International Multicentric Retrospective Study, 28 Eur. J. Neurol. 2846 (2021).

[18] James J. Sejvar et al., Guillain-Barré Syndrome and Fisher Syndrome: Case Definitions and Guidelines for Collection, Analysis, and Presentation of Immunization Safety Data, 29 Vaccine 599 (2011).

[19] Nobuhiro Yuki & Hans-Peter Hartung, Guillain-Barré Syndrome, 366 NEJM 2294 (2012).

[20] Kazim A. Sheikh, Guillain-Barré Syndrome, 65 Contimuum (Minneap. Minn.) 1184 (2020).

"Presenting symptoms often include tingling or numbness of the digits, weakness of the limbs, hyporeflexia or areflexia, fatigue, and abnormal sensations." Id.; see also Resp. Ex. A-11 at 4, 4 tbl. 1;[21] Pet. Ex. 5 at 1582 ("CIDP is closely related to [GBS] and it is considered the chronic counterpart of that acute disease.").

CIDP and GBS have overlapping features, making differentiation difficult, and although "definitive criteria for differentiation remain elusive," certain factors can be used to distinguish the two. Resp. Ex. A-9 at 1, 3-4 ("Overlapping clinical features, particularly in the early stages, complicate differentiation between recurrent GBS and CIDP.");[22] see also Resp. Ex. A-3 at 13 tbl. 3.3; Resp. Ex. A-8 at 2, 6, 6 fig. 1, 11.[23]

GBS has a monophasic course, with recurrence rarely reported. Resp. Ex. A-3 at 4; Resp. Ex. A-7 at 3. But see Resp. Ex. A-9 at 1-2 ("While GBS typically follows a monophasic course, some patients experience treatment-related fluctuations or recurrences, posing diagnostic challenges in distinguishing GBS from acute-onset [CIDP]."). The onset phase in CIDP is typically more than eight weeks, with remitting and relapsing symptoms, while GBS symptoms peak within four weeks. Resp. Ex. A-4 at 1, 5;[24] Resp. Ex. A-5 at 2, 4; Resp. Ex. A-6 at 2 ("Progression [of GBS] beyond [four] weeks is unusual and should raise concern for other illnesses, particularly [CIDP].");[25] Resp. Ex. A-40 at 3 (noting "CIDP may . . . have a GBS-like onset").[26] Treatment with IVIG and plasma are optimal in GBS, while treatment with steroids, which has not been shown to be helpful in GBS, may benefit CIDP patients. Resp. Ex. A-4 at 1, 8; Resp. Ex. A-7 at 8; Resp. Ex. A-11 at 12-13; Resp. Ex. A-40 at 4; Pet. Ex. 65 at 10.[27]

---

[21] Peter Y. K. Van den Bergh et al., European Academy of Neurology/Peripheral Nerve Society Guideline on Diagnosis and Treatment of Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Report of a Joint Task Force—Second Revision, 28 Eur. J. Neurol. 3556 (2021).

[22] Berin Inan et al., Differentiating Recurrent Guillain-Barre Syndrome and Acute-Onset Chronic Inflammatory Polyneuropathy: Literature Review, 124 Acta Neurologica Belgica 1467 (2004).

[23] Pieter A van Doorn et al., European Academy of Neurology/Peripheral Nerve Society Guideline on Diagnosis and Treatment of Guillain-Barré Syndrome, 30 J. Peripher. Nerv. Sys. 3646 (2023).

[24] Hugh J. Willison et al., Guillain-Barré Syndrome, 388 Lancet 717 (2016).

[25] Peter D. Donofrio, Guillain-Barré Syndrome, 23 Contimuum (Minneap. Minn.) 1295 (2017).

[26] Robert D.M. Hadden & Richard A.C. Hughes, Management of Inflammatory Neuropathies, 74 (Suppl. II) J. Neurol. Neurosurg. & Psychiatry ii9 (2003). This was also filed as Pet. Ex. 39.

[27] Richard A.C. Hughes & David R. Cornblath, Guillain-Barré Syndrome, 366 Lancet 1653 (2005). This was also filed as Pet. Ex. 22 and Resp. Ex. A-43.

Some patients initially diagnosed with GBS are eventually diagnosed with CIDP. Resp. Ex. A-4 at 8. Willison et al. explain that "[s]ome patients initially diagnosed with [GBS] can have several episodes of deterioration," and "[o]thers initially have a rapidly progressive course like [GBS], but subsequently have further progression exceeding [four] weeks. In these patients, the question often arises as to whether the diagnosis is still consistent with [GBS], or [whether] the patient has [CIDP] with acute onset." Id. Willison et al. added, "[t]he diagnosis of acute onset [CIDP] should especially be considered in patients initially diagnosed with [GBS] who have three or more periods with clinical deterioration, or when there is a new deterioration after [eight] weeks from onset of weakness." Id.; see also, e.g., Resp. Ex. A-6 at 12 ("The initial phase of the illness is almost always diagnosed as GBS. Over time, the question of CIDP arises if the patient has a long protracted course of weakness, particularly if progression occurs after the first [four] weeks. If the patient experiences more than one treatment-related fluctuation, and particularly if it occurs [two] months or more after [] onset . . . , then . . . CIDP becomes a strong consideration."); Resp. Ex. A-7 at 3 ("Clinical deterioration after initial improvement or stabilization with immunotherapy suggests that the treatment had a transient effect or that [CIDP] is present."); Resp. Ex. A-8 at 2 ("[A]cute-onset [CIDP] should be considered if progression continues after [eight] weeks from onset, which occurs in around 5% of patients initially diagnosed with GBS.").

## C. Factual History

### 1. Relevant Medical History[28]

#### a. Pre-Vaccination

Petitioner had an extensive pre-vaccination medical history relevant to this matter.

##### i. 2001 to 2007

In the fall of 2001, at 16 years old, Petitioner was diagnosed with EDS. Pet. Ex. 10 at 106, 141, 144, 157. Her mother and sister also have EDS. Id. at 106. Petitioner has "multiple hyper mobile joints." Id. at 133, 141, 153. Her EDS was characterized by joint laxity, buckling knees, and ankles turning while walking, which has led to falls and difficulty with stairs, balance, and walking on uneven surfaces. Id. at 28, 76. She reported "a long history of difficulty with full use of her hands, which she relate[d] to her [EDS]." Id. at 77. She also has a "history of recurrent patellar dislocation" and "recurrent dislocation of both ankles" related to her EDS. Id. at 125, 132-33, 141.

On May 13, 2002 and February 4, 2003, Petitioner was involved in motor vehicle accidents ("MVAs"), and she began reporting neck and low back pain, muscle spasms, and

[28] This summary of medical records is taken from Respondent's brief, as the undersigned finds it provides an accurate representation of the records. See Resp. Response at 3-24. The undersigned has made edits, deleted less relevant entries, and has included additional information.

headaches. Pet. Ex. 10 at 134-39. She was diagnosed with cervical, thoracic, and lumbar strain. Id. at 136.

In the summer of 2004, at 18 years of age, Petitioner presented to various cardiologists for shortness of breath, numbness in her hands, swelling in her feet, and a prominent heart murmur. Pet. Ex. 10 at 122-26. She was diagnosed with aortic insufficiency[29] and a modest-sized patent ductus arteriosus (a congenital heart defect),[30] but a cardiologist felt Petitioner's numbness and swelling were "not clearly linked to her cardiac problems." Id. at 81, 111, 122-30, 151. Petitioner underwent a percutaneous closure of her patent ductus arteriosus in January 2005 to correct the heart defect. Id. at 81, 111, 122 (noting Petitioner's sister also required repair of a heart defect). Even with the procedure, however, Petitioner requires life-long subacute bacterial endocarditis prophylaxis and long-term cardiology care. Id. at 127.

On April 16, 2005, Petitioner was involved in another MVA. Pet. Ex. 10 at 117, 119. She developed pain in her posterior right neck, radiating pain down her right upper arm, and low back and left hip pain, and she again was diagnosed with cervical and lumbar strain. Id.

On January 18, 2006, at the age of 20, Petitioner reported to her primary care provider ("PCP") that she had been experiencing numbness in her feet, hands, and legs, but not her arms, difficulty with her grip, weakness in her legs ("her legs [were] like spaghetti"), and that she had been "walking funny" since she had her tonsils removed three weeks prior. Pet. Ex. 10 at 113. After an evaluation by a cardiologist, who did not consider her symptoms to be heart-related, Petitioner was referred to a neurologist. Id. at 111-13.

Petitioner presented to neurologist Hamid Rabiee, M.D., on May 18, 2006. Pet. Ex. 10 at 105. Regarding her heart defect, Petitioner reported excessive daytime sleepiness and exertional shortness of breath. Id. She had surgery in 2005, "which improved some of her symptoms." Id. Petitioner recalled that beginning in approximately July 2005, she started having approximately weekly attacks of shakiness, exhaustion, and heart palpitations. Id. She reported a history of EDS. Id. Petitioner also reported numbness in her hands and feet "for many years" that has gradually progressed to clumsiness and weakness in her hands. Id. She felt her clumsiness and hand numbness caused "some limitations at work." Id. at 106. Under review of systems, Petitioner reported headaches in her bifrontal area, depression and anxiety, difficulty sleeping, "bad dizziness," lightheadedness "especially if she [stood] up fast," numbness in her feet, imbalance, leg cramps, and difficulty with ambulation. Id. at 105.

---

[29] Aortic insufficiency is the "defective functioning of the aortic valve, with incomplete closure resulting in aortic regurgitation." Aortic Insufficiency, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=82910 (last visited Sept. 15, 2026).

[30] Patent ductus arteriosus is the "abnormal persistence of an open lumen in the ductus arteriosus after birth, the direction of flow being from the aorta to the pulmonary artery, resulting in recirculation of arterial blood through the lungs." Patent Ductus Arteriosus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=71852 (last visited Sept. 15, 2026).

On neurologic examination, Petitioner exhibited diminished pinprick, light touch, and vibration sensory responses up to the ankles bilaterally; hypoactive and symmetric deep tendon reflexes ("DTRs") in her biceps, triceps, brachioradialis, knee jerks, and ankle jerks; a "slightly clumsy" gait that might have been related to her hypermobile joints secondary to EDS; and a slightly abnormal Romberg test (unsteady gait without fall). Pet. Ex. 10 at 107. Dr. Rabiee felt Petitioner's intermittent symptoms were "more suggestive of anxiety attacks or panic attacks," with a "remote possibility of [a] seizure disorder." Id. Dr. Rabiee also noted Petitioner "d[id] have a peripheral neuropathy of the symmetric type that might be related to a hereditary condition or to [EDS], and might need further evaluation at a later time." Id. He ordered a brain magnetic resonance imaging ("MRI"). Id.

On July 17, 2006, Petitioner followed up with Dr. Rabiee. Pet. Ex. 10 at 103. Her brain MRI, performed earlier that month, suggested periventricular nodular heterotopia (a genetic brain malformation that caused seizures) with a possibility of tuberous sclerosis (a genetic disease that caused benign brain tumors).[31] Id. On examination, Petitioner again had absent DTRs. Id. Later that year, Petitioner was diagnosed with a genetic seizure disorder and was prescribed seizure medication. Id. at 28, 76, 97.

Approximately fifteen months later, on October 24, 2007, Petitioner returned to Dr. Rabiee. Pet. Ex. 10 at 96-98. Petitioner reported chronic fatigue ("all her life"), irregular bowel movements, headaches, dizziness, blurred vision, additional seizures, one fall, involuntary tremors in her upper limbs (which she associated with anxiety), intermittent numbness in her arms and hands, and gradual and progressive weakness in arms and hands with difficulty opening, carrying, and gripping objects and with fine dexterity. Id. at 96-97. Other than an abnormal Romberg test, Petitioner's neurologic examination was unremarkable. Id. at 97. Dr. Rabiee did not provide any new diagnosis and recommended that Petitioner continue her seizure medication. Id.

**ii. 2008 to 2010**

On February 29 and March 14, 2008, at 22 years old, Petitioner saw her PCP with upper respiratory symptoms and diarrhea, but no fever or chills, and was diagnosed with asthmatic bronchitis and gastroenteritis (possible adverse reaction to antibiotics or viral illness). Pet. Ex. 10 at 70.

On March 16, 2008, Petitioner presented to the emergency department ("ED"). Pet. Ex. 10 at 90. Petitioner reported having an influenza ("flu")-like illness for two weeks, which started as a nonproductive cough, "with some improvement [] on antibiotics for ten days." Id. She also had a fever, weakness, and pain. Id. at 81, 90. That day, she became "so achy all over that she could not get out of bed and [was] too weak to sit up." Id. at 90. She reported "quite a bit of diarrhea without blood or mucus." Id. On examination, Petitioner was noted to be "acutely ill-appearing" and "quite flushed with conjunctival injection." Id. She had "[d]usky nailbeds" and her extremities were "quite hot." Id. at 91. The ED provider's impression included viral illness

[31] Petitioner's mother has periventricular nodular hyperplasia and a history of epilepsy. Pet. Ex. 10 at 36, 69, 76.

or mycoplasma and suspected pulmonary hypertension limiting Petitioner's "cardiac ability to respond to fever and possible viral infection." Id. at 91-92. He recommended assessing Petitioner for *Clostridioides* ("*C.*") *difficile* due to her flu-like illness with diarrhea. Id.

From March 16 to 22, 2008, Petitioner was hospitalized. Pet. Ex. 10 at 81. During this period, she had peripheral weakness, which neurology thought was GBS, and she was treated with five days of plasmapheresis with moderate improvement in her strength. Id. CSF was consistent with GBS (elevated protein with no white blood cells). Id. at 75. Petitioner also had multiple stool studies, including for *C. difficile*, rotavirus, norovirus, giardia, and ova and parasites, which were all negative, and she tested negative for the flu virus. Id. At discharge, Petitioner's diagnoses included GBS, pulmonary hypertension, EDS, diarrhea, and "[f]lu-like illness with diarrhea, nausea, vomiting, [and] dehydration." Id. at 81. Petitioner was to continue outpatient plasmapheresis treatment for her GBS. Id. at 82.

On March 27, 2008, an electromyography ("EMG")/nerve conduction study ("NCS") showed a "[d]iffuse demyelinating polyneuropathy involving [four] limbs with some concomitant axonal damage" that was considered "predominantly compatible" with AIDP/GBS. Pet. Ex. 10 at 83-86. The history noted that Petitioner's symptoms were preceded by flu-like symptoms and diarrhea. Id. at 83.

On May 29, 2008, Petitioner was evaluated by Marie Gonella, M.D., a resident neurologist at a neuromuscular clinic. Pet. Ex. 10 at 74-79. Petitioner stated she received flu and pneumonia vaccinations before beginning work at a preschool. Id. at 74, 94 (documenting pneumonia (pneumovax) vaccination on February 7, 2008).[32] Within one week of beginning work, she developed fevers, a cough, and chills, which persisted, on and off, for approximately three weeks. Id. at 74. Petitioner also reported lower quadrant abdominal pain and diffuse weakness during that period. Id. She explained she had "a long history of diarrhea which increased before and during her acute [GBS] course." Id. at 75. She also noted her history of tingling in hands and feet "for many years" and reported that she did not notice any change in the tingling. Id. Her CSF and EMG/NCS results were considered consistent with GBS. Id. Petitioner was using a walker, more around the house than in public. Id. at 76. Dr. Gonnella believed Petitioner "should likely have a full or nearly full recovery." Id. at 78. Dr. Gonnella also suggested that Petitioner "m[ight] have neuropathy, per her history, before her [GBS], although there [wa]s no way to be certain at this point." Id.

Approximately four months later, Petitioner underwent a repeat EMG/NCS on October 9, 2008 which was unchanged from her prior study. Pet. Ex. 10 at 71-73. Under history, Petitioner was noted to be "doing much better," but without any change in her pre-GBS numbness in hands and feet. Id. at 71.

Petitioner returned to Dr. Rabiee one year later, on October 21, 2009, at 24 years of age. Pet. Ex. 10 at 62. She felt her "overall condition [wa]s worse." Id. She described additional seizures, after which she experienced right-sided numbness and "pounding headaches." Id. Dr. Rabiee's assessment included lower limb peripheral neuropathy. Id.

---

[32] The undersigned was unable to locate receipt of this flu vaccination in the medical records.

In early 2010, Petitioner was treated for a gastrointestinal illness (unknown cause), seasonal allergies, and asthma. Pet. Ex. 10 at 54, 59. She was also treated for a "painful lump" and thickened skin on the bottom of her right foot, which was considered most likely "a result of her neuropathy." Id. at 55.

On May 4, 2010, Petitioner followed up with Dr. Rabiee. Pet. Ex. 10 at 56. She reported overall improved generalized weakness, painful numbness in the bottom of her feet, and less frequent headaches. Id. Brain MRI in March 2010 was noted to be unchanged when compared with the 2008 brain MRI. Id. Dr. Rabiee's assessment was "[s]tatus post GBS with probable residual numbness of the feet." Id.

### iii. 2011 to 2013

On January 21, 2011, Petitioner presented to the ED with bleeding in her mouth. Pet. Ex. 10 at 47. The ED provider was "just not certain what [had] happened," but he diagnosed Petitioner with epigastric versus chest pain of uncertain etiology and a mildly low platelet level. Id. at 48. Six days later, Petitioner was evaluated by her PCP, who prescribed omeprazole (a proton-pump inhibitor usually prescribed for gastroesophageal reflux disease). Id. at 43.

In mid-2011, Petitioner became pregnant and, while her pregnancy was high risk, she delivered her first child via cesarian section ("C-section") in January 2012 without any complications. Pet. Ex. 10 at 28, 40-41.

Approximately six months after her C-section, on July 26, 2012, Petitioner attended an initial outpatient physical therapy ("PT") evaluation for dizziness, ("like she was on a boat"), weakness, a sensation of pins and needles in her arms, eye issues, headaches, and fatigue. Pet. Ex. 10 at 39. The physical therapist noted that Petitioner's clinical findings indicated "possible peripheral vestibular hypofunction" and that she could not "rule out a central [nervous system] problem or the possibility that her symptoms [were] related to chronic [GBS] or rather [CIDP]." Id.

On July 30, 2012, Petitioner reported worsening and diffuse tingling, especially in the fingertips and tongue, to her PCP. Pet. Ex. 10 at 23. She complained of generalized weakness that interfered with her ability to walk stably and diffuse weakness that was most prominent in her proximal arms and legs. Id. She also described worsening headaches "over the last six to eight weeks." Id. The PCP ordered an urgent brain MRI, which occurred that day and was normal. Id. at 23, 181-82.

On August 29, 2012, Petitioner established care with neurologist Robert Fisher, M.D., Ph.D., who specialized in treating epilepsy. Pet. Ex. 10 at 36. Petitioner stated her "main symptomatic problem [wa]s burning-tingling in her arms and legs." Id. She reported she had returned to "normal (always has numbness in her feet)" after GBS in 2008, but the burning sensation and weakness in her arms returned in June 2012. Id. She reported leg weakness and numbness and numbness in her lips, tongue, and groin area. Id. She was noted to have an allergy to the flu vaccine. Id. at 37.

On examination, Dr. Fisher noted diffuse weakness, mostly absent reflexes, and absent responses to sensory tests. Pet. Ex. 10 at 37-38. He noted Petitioner's "current problem [was] a two-month progressive history of weakness and numbness" that "could be chronic relapsing polyradiculopathy, but other causes of neuropathy [would] need to be ruled out." Id. at 38. He recommended that Petitioner be admitted to a hospital for further assessment and probable therapy with immune agents and gabapentin. Id.

Petitioner was hospitalized from August 29 through September 2, 2012. Pet. Ex. 10 at 33. An EMG/NCS on August 30, 2012 showed "signatures of demyelinating more than axonal pathology, suggestive of recurrent [GBS]." Id.; see also Pet. Ex. 12 at 426-27. Additional testing during hospitalization for other causes were negative. Pet. Ex. 10 at 27, 33. She was treated with IVIG and gabapentin. Id. at 33.

On October 9, 2012, at 27 years of age, Petitioner had a post-hospitalization visit with neurology resident Nirali Vora, M.D. Pet. Ex. 10 at 27-32. Since discharge, Petitioner reported "very mild, gradual improvement in her symptoms." Id. at 27. She "[was] primarily concerned with profound, disabling fatigue." Id. She felt weak when raising her arms or attempting to walk, which was noted to be from lack of energy or due to her GBS. Id. Petitioner "require[d] a walker for long distances." Id. "She ha[d] difficulty holding a pen or feeding her baby with a spoon which seem[ed] worse from her baseline hand grip weakness." Id. She remained unable to work. Id. at 27, 29. Petitioner's "complex, neuromuscular history" was reviewed, including her "lifetime" of tingling in her hands and feet (which Petitioner attributed to EDS) and her diagnoses of GBS in 2008 and 2012. Id. at 28. The flu vaccine "[was] reported as an 'allergy' due to subsequent [GBS]." Id.

On examination, Petitioner was "mildly tremulous in her upper extremities with arms extended," she had "mild atrophy of her intrinsic hand muscles," and she had "distal weakness with break-way proximal strength." Pet. Ex. 10 at 29. She had mild weakness in wrist and finger extension and flexion, dorsal interossei muscles in the hands, ankle dorsiflexion, plantar flexion, and anterior neck flexion. Id. She also had 2/5 strength in bilateral extensor hallucis longus (muscle responsible for pulling the big toe upward) that she reported was her "baseline." Id. She could not tandem walk, had difficulty with heel walk, and her Romberg test was positive. Id. Her sensory examination was notable for absent proprioception at the toes, with reconstitution at the ankle, and absent proprioception in the right distal interphalangeal joints, with wrist intact. Id. Vibration was absent at the toes; diminished at the ankles, knees, proximal interphalangeal joints, and elbows; and intact at the shoulder. Id. She also had reduced temperature and "essentially absent" reflexes "except for possibly trace biceps." Id. Dr. Vora reviewed Petitioner's 2008 and 2012 EMG/NCS. Id. at 29-31. Dr. Vora's differential diagnosis included "recurrent GBS/AIDP," CIDP ("given the prolonged > [four] week onset of symptoms"), or "another form of demyelinating polyneuropathy given the 'baseline' areflexia." Id. at 31. Dr. Vora noted "a peripheral neuropathy has been linked to [EDS]," but it "is not explicitly demyelinating," and she found no case reports of EDS patients with recurrent AIDP or

CIDP. Id. She also wrote, "There has been a case of [CMT] with [EDS] type IV."[33] Id. She completed disability paperwork for Petitioner. Id. at 32. Dr. Vora recommended a repeat EMG/NCS, which occurred on December 6, 2012, and was "nearly identical" to her August 2012 EMG/NCS. Id. at 24-25, 31.

On January 15, 2013, Petitioner followed up with Dr. Vora. Pet. Ex. 10 at 24-26. Dr. Vora noted that Petitioner was seen previously "with no definite criteria for CIDP and [with] questions of hereditary neuropathy or slowly recovering AIDP." Id. at 24. Petitioner's examination was noted to be "stable" with "generalized subjective weakness [being] fatigue or mood related." Id. at 26. After examining Petitioner, Dr. Vora concluded that the "[e]tiology of neuropathy remain[ed] unclear." Id. at 25. She wrote that Petitioner's "latest episode of relapse - ? 2nd episode of [GBS] – [wa]s not that convincing of true [GBS]." Id. at 25-26. She believed "[t]he diffuse uniform slowing seen on NCS raise[d] another interesting possibility of a hereditary neuropathy, though residual abnormality from prior AIDP/GBS remain[ed] possible." Id. at 26. At that time, Dr. Vora was unable to diagnose Petitioner with CIDP and saw no indication for additional IVIG or plasmapheresis. Id. Dr. Vora advised that Petitioner to bring her sister to the next appointment so she could undergo her own neuromuscular examination.[34] Id.

On April 4, 2013, Petitioner saw her PCP with "significant bruising and some swelling to her right foot." Pet. Ex. 10 at 16. Her fingers and toes appeared "somewhat deformed" and showed some discoloration. Id. Her PCP "ruled out serious foot fractures," "voice[d] [] concern[s] about [Petitioner's] co-morbidities (circulation issues and neuropathies)," and recommended continued monitoring. Id.

**iv. 2014 to 2018**

Other than a second pregnancy and C-section and transitioning to a new PCP, William Oligmueller, M.D., Petitioner did not have any substantively different treatment until late 2016. Pet. Ex. 1 at 41; see, e.g., Pet. Ex. 4 at 111-12.

On August 16, 2016, at 30 years old, Petitioner established care with a speech and language pathologist and reported that she had been "choking on thin liquids" for five years and that more recently, she had been feeling "food sticking in her throat." Pet. Ex. 1 at 41. Petitioner did a video-fluoroscopic modified barium swallow study that day with normal results. Id. at 21, 42. The pathologist diagnosed her with pharyngoesophageal dysphagia (difficulty swallowing).

---

[33] Petitioner's EDS type had not been confirmed at or prior to this visit. See Pet. Ex. 10 at 25 "presumed type III but no genetic testing"), 31 ("presumed Type III"). Nor has Petitioner's EDS type been confirmed since this visit. The undersigned does not find the type of EDS Petitioner has to be relevant to this Decision.

[34] Petitioner's father joined her at this visit and a "[b]rief neurological examination" of Petitioner's father was "unremarkable." Pet. Ex. 10 at 25. It does not appear that Petitioner returned to Dr. Vora following this visit.

Id. at 40. Petitioner's subsequent testing, including biopsies of her gastrointestinal system and a colonoscopy, were unrevealing. Id. at 89, 91-94, 98-101, 105-06, 157.

On July 21, 2017, when she was 31 years old, Petitioner established care at a pain management clinic. Pet. Ex. 6 at 35. Petitioner reported her history of GBS, after which she had been "unable to walk for almost a year," and "[s]ince that time, she has complained of thoracic back pain. Id. She further reported that her PCP ordered "plain films," which showed scoliosis in her thoracic area. Id. Assessment was "[t]horacic lumbar back pain after a long bout of [GBS] with scoliosis." Id. The specialist ordered thoracic and lumbar spine MRIs, prescribed a non-steroidal anti-inflammatory, and referred Petitioner to acupuncture. Id. at 35-36.

Petitioner reviewed her imaging results with Michael Brown, D.O., at the pain management clinic on August 29, 2017. Pet. Ex. 6 at 32. She described low thoracic axial burning pain. Id. at 32-33. Dr. Brown diagnosed Petitioner with spondylosis (without myelopathy or radiculopathy) in her thoracic region and, on September 18, 2017, he administered a facet joint block injection into her thoracic facets. Id. at 26-30, 33. At her follow up appointment on October 24, 2017, Petitioner reported the injection provided pain relief for three weeks and the trial pregabalin (a nerve pain medication) had helped her pain. Pet. Ex. 6 at 24. Diagnosis was chronic pain syndrome and Petitioner was prescribed a higher pregabalin dose. Id. at 25.

On January 16, 2018, when she was 32 years old, Petitioner established care with neurology physician assistant ("PA") Bradley Martin. Pet. Ex. 3 at 17, 19. She reported she had had a severe and constant headache "since Christmas," which worsened when she tried prednisone for a sinus infection. Id. at 20. She relayed that her typical headaches were associated with an aura, while this headache felt "more like a pressure and [was] more frequent." Id. She felt dazed and as if her left eye was swollen. Id. Although her GBS was "stable," Petitioner reported "a lot of pain" in her legs, hands (including burning pain), and feet. Id. at 19-20. Her back also was "killing her now," and she described pain under her left eye. Id. at 20. She was on daily pregabalin, which improved her symptoms. Id. at 19-20. Although gabapentin had helped, she experienced withdrawal symptoms. Id. at 20. Petitioner also reported her seizure disorder and EDS were controlled. Id. Physical examination revealed pinprick deficits in her extremities, decreased reflexes bilaterally, and an absent Babinski sign. Id. at 23-24. PA Martin administered a ketorolac injection for Petitioner's pain and prescribed Imitrex for her migraines. Id. at 19, 26. He also prescribed a pain medication to use on an as-needed basis, increased Petitioner's pregabalin dose, and offered an oral steroid, which Petitioner declined. Id. at 19-20.

On February 19, 2018, Petitioner returned to Dr. Brown to request another facet joint block because she recalled having experienced "> 80% relief" from the prior injection. Pet. Ex. 6 at 23. Dr. Brown administered the facet joint block on March 27, 2018. Id. at 17-21. Before the procedure that day, Petitioner reported bilateral hand paresthesia and asked if she could receive an injection in her hands. Id. at 18. She was advised to make another appointment to address her hand concerns.[35] Id.

---

[35] It does not appear that Petitioner made another appointment for her hand concerns.

On December 5, 2018, Petitioner saw Lydia Kay Pyle, NP, for a "sore throat since [T]hanksgiving night," which was followed by a dry cough that was now productive. Pet. Ex. 5 at 1630. Chest congestion was also noted. Id. at 1629-30. Rapid strep test was negative and a chest X-ray was done and was normal. Id. at 1620-21, 1629, 1632-33. Petitioner was prescribed Mucinex, Tessalon, Robitussin, and steroids. Id. at 1629.

**b. Vaccination**

On December 13, 2018, at 33 years old, Petitioner saw Dr. Oligmueller after she had been involved in an MVA earlier that day. Pet. Ex. 4 at 31-39. She also complained of an upper respiratory infection. Id. at 33, 36. She reported upper back pain, neck soreness, muscle spasms, pain of the right shoulder and right neck area, and tenderness of the right shoulder. Id. at 36. She had no numbness or tingling in her arm. Id. She also had "possibly resolving viral symptoms." Id. at 35-36. Neurological examination was normal with "normal muscle tone." Id. at 38. No arm weakness or other weakness was documented. Id. Dr. Oligmueller recommended conservative treatment for her MVA-related symptoms, prescribed antibiotics for Petitioner's acute bronchitis (unspecified organism), and recommended the Tdap vaccination, which Petitioner received that day. Id. at 35-36, 39.

**c. Post-Vaccination**

One month post-vaccination, on January 15, 2019, Petitioner saw Dr. Brown for pain that radiated from her neck into her arm after the MVA. Pet. Ex. 6 at 14. Review of systems did not identify any changes in the musculoskeletal system. Id. There was no report of weakness, arm weakness, numbness or tingling. Id. Petitioner did not report loss of sensation or bowel or bladder dysfunction and was noted to be ambulatory during the visit. Id. at 14-15. Dr. Brown diagnosed Petitioner with cervical disc disorder at C6-C7 with radiculopathy and scheduled another epidural injection. Id. at 15.

On January 25, 2019, 43 days post-vaccination, Petitioner saw Dr. Oligmueller for chief complaint of flu. Pet. Ex. 5 at 1592-93. She reported that she had begun experiencing muscle aches, a headache, congestion, runny nose, sinus pressure, sneezing, fever, chills, and fatigue the day before. Id. at 1595-97. Review of systems was negative for dizziness or weakness. Id. at 1597. Physical examination revealed that Petitioner appeared tired, but she had no weakness of her extremities, gait abnormalities, or numbness or tingling. Id. at 1598. She was concerned she had the flu and noted that her child had been positive with a flu infection that past week. Id. at 1596. Dr. Oligmueller ordered rapid flu A and B tests, which were both negative. Id. at 1599. He noted, however, that rapid tests were "only about 67% sensitive" and that Petitioner's daughter had "very common" flu symptoms. Id. at 1595. Thus, he decided he would "treat [Petitioner] empirically with Tamiflu" and diagnosed Petitioner with the flu. Id. at 1593, 1595. No neurological symptoms were reported or noted on examination. Id. at 1597-98.

On February 20, 2019, 69 days post-vaccination, Petitioner returned to PA Martin for a follow up. Pet. Ex. 5 at 1569. She explained "since she had the flu, she [had been] feeling tired all over" and "[s]he [was] having weakness in her arms." Id. at 1573. She described her

symptoms as "GBS like." Id. On examination, Petitioner had absent reflexes in her upper extremities, reduced reflexes in her lower extremities, and reduced strength (especially with grip) in her upper extremities. Id. at 1575-76. PA Martin's assessment included GBS/CIDP that was "uncontrolled after [Petitioner] recently had [the] flu." Id. at 1571-72. PA Martin prescribed a five-day course of IVIG, which he noted Petitioner "m[ight] need to use [] monthly." Id. at 1572. His plan included educating Petitioner on CIDP. Id. He ordered brain and cervical spine MRIs to ascertain whether Petitioner had demyelinating lesions/multiple sclerosis. Id. at 1443, 1572, 1586.

Petitioner received IVIG treatment from March 4 to 8, 2019. Pet. Ex. 5 at 1478-530. On March 19, 2019, Dr. Brown administered an epidural injection at C7-T1 as previously scheduled. Pet. Ex. 6 at 7-13.

Petitioner followed up with Dr. Oligmueller on March 25, 2019. Pet. Ex. 5 at 1467-73. She described chest pain, heaviness, and tightness since starting IVIG. Id. at 1471. Dr. Oligmueller ordered a chest CT and advised Petitioner to continue care with her neurologist for her CIDP. Id. at 1470-71.

On March 28, 2019, Petitioner saw PA Martin and reported that IVIG "did not help" and that her "weakness [wa]s worse." Pet. Ex. 5 at 1443. She felt more weakness in her legs and had resumed using a walker due to difficulty ambulating. Id. She described "constant pain in [her] hands and feet . . . like there [was] acid on her hands." Id. Pregabalin was ineffective. Id. Petitioner's chest CT did not reveal any relevant findings; she had not yet undergone the brain and cervical spine MRIs. Id. at 1448-49. PA Martin updated his assessment to "worsening" GBS/CIDP "despite recent IVIG after [Petitioner] recently had [the] flu." Id. at 1442. He believed Petitioner's "etiology seem[ed] consistent with CIDP given [the] lack of patellar reflexes." Id. He also felt Petitioner's uncontrolled neuropathic pain was "likely from" GBS/CIDP. Id. It was "unclear if [Petitioner's depression was] contributing." Id. at 1442-43. PA Martin increased Petitioner's pregabalin dose, ordered PT, and noted a repeat lumbar puncture might be needed if he could not procure her prior results. Id. at 1443.

The next day, on March 29, 2019, Petitioner established care with neurologist Scott Strader, M.D. Pet. Ex. 5 at 1412. Petitioner recounted she had GBS in 2008, from which she had essentially fully recovered, before she "experienced a possible recurrence" in 2012. Id. at 1415. She recalled a slower recovery in 2012, with "[g]radual improvement in functional status [] until January 2019," when she had an MVA and an infectious illness. Id. Since then, Petitioner stated she "ha[d] been having significant neurologic symptoms that [we]re reminiscent of symptoms prior to her [two] episodes diagnosed as [GBS]." Id. More specifically, Petitioner described a "constant burning sensation in her fingers" and dysesthesias in both feet that "wax[ed] and wane[d] in intensity but [we]re always present." Id. She occasionally felt an "electrical shocking sensation in various body regions" and painful numbness in her arms. Id. She was easily fatigued but had difficulty sleeping. Id. She reported her "motor difficulty ha[d] progressed to the point where . . . she [was] unable to walk without a walker." Id. Petitioner

also reported that her skin occasionally would be "very hot to the touch" and she recalled that she had "trouble sensing temperature and stereognosis"[36] even before her GBS diagnosis. Id.

Physical examination revealed bilateral weakness in proximal and distal upper extremities, hip flexion, thigh abduction and adduction, knee flexion, and dorsiflexion; trace to absent reflexes throughout biceps, brachioradialis, triceps, quadriceps, and Achilles; decreased pinprick throughout bilateral distal lower legs; and decreased vibration at the toes, but intact at the right ankle and left knee. Pet. Ex. 5 at 1418. Dr. Strader "discussed with [Petitioner] that CIDP [was] a possibility," as was always the case when "a diagnosis of possible recurrent GBS is entertained." Id. at 1414. He noted, however, that "some of [Petitioner's] symptoms, as well as findings on [examination], could potentially suggest an inherited neuropathy." Id. He also noted that "[p]ain certainly can be a feature of [EDS], although [Petitioner's] description of pain seem[ed] to fit better with a neuropathic etiology." Id. Lastly, he commented that "CIDP would [] be an unusual diagnosis in [Petitioner's] age group." Id. Dr. Strader ordered a genetic neuropathy testing panel, a repeat lumbar puncture, a repeat EMG/NCS, and in-home PT. Id.

On April 3 and 4, 2019, Petitioner underwent the lumbar puncture and brain and cervical spine MRIs. Pet. Ex. 5 at 1357, 1367, 1384. Dr. Strader concluded on April 8, 2019, after reviewing the results, that "[o]verall, . . . the results d[id] in fact look most like CIDP." Id. at 1357. Petitioner's brain MRI was unremarkable. Id. He interpreted Petitioner's cervical spine MRI as showing "larger and thicker than usual" nerve roots as "they emerge[d] from the spinal cord on their way down the arms" and that they "[took] up the contrast dye." Id. He opined "[t]hese are [] findings that would be seen in CIDP." Id. Additionally, Petitioner's CSF contained "a high level of protein without a high number of white blood cells," which Dr. Strader explained was a "pattern we would expect in CIDP (as well as [GBS])." Id. Dr. Strader recommended a three-day steroid course, which could be "helpful in CIDP" but "counterproductive in the early stages of [GBS,]" before resorting to "more invasive" plasmapheresis. Id. at 1357-58. That same day, Petitioner's spouse conveyed that Petitioner was "complaining about her left leg being completely numb" and asked to start the steroid treatment as soon as possible. Id. at 1357.

On April 12, 2019, Petitioner had an in-home PT evaluation. Pet. Ex. 5 at 1341. Petitioner thought her "flair up most likely started from her having the flu and MVA." Id. at 1342. The physical therapist noted a poor prognosis for improvement but provided a plan to prevent further decline. Id. at 1341. Later that day, Petitioner began her IV steroid course, which she completed on April 14, 2019. Id. at 1294, 1322.

On April 18, 2019, Petitioner's spouse advised Dr. Strader that Petitioner was "still feeling pretty bad." Pet. Ex. 5 at 1293. He stated that Petitioner was walking better and looked and sounded better after a couple of days, but had since "gone back downhill." Id. He reported Petitioner's "whole body [was] numb again." Id. On April 22, 2019, Petitioner's spouse reached

[36] Stereognosis refers "the faculty of perceiving and understanding the form and nature of objects by the sense of touch." Stereognosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=47135 (last visited Sept. 15, 2026).

out again, inquiring about plasma treatments, and Dr. Strader prescribed seven plasma exchanges. Id. at 1283-84.

On April 26, 2019, Petitioner returned to PA Martin for a follow-up of her CIDP. Pet. Ex. 5 at 1244. She relayed she was experiencing vertigo and "having pain in her abdomen and ribs" that felt "like squeezing." Id. at 1245. She reported that steroids "made [her] symptoms worse," that IVIG was ineffective, and that she had past reactions to plasmapheresis. Id. PA Martin updated Petitioner's diagnosis to only CIDP, noted worsening weakness, and increased her nerve pain medication dose. Id. at 1244. A May 14, 2019 chest X-ray for left-sided rib pain was unremarkable. Id. at 1187.

Petitioner began plasmapheresis on May 16, 2019. Pet. Ex. 5 at 1143. On May 18, 2019, Petitioner attended a renal evaluation as part of the monitoring for her plasmapheresis treatment. Id. at 1110. She attributed her "slow deterioration" to her January 2019 flu infection. Id. at 1111. The renal specialist's assessment included CIDP. Id. at 1110.

On May 23, 2019, Petitioner presented to Dr. Strader for an EMG/NCS, which showed "a severe sensorimotor polyneuropathy that [was] primarily demyelinating in nature, with demyelination likely acquired." Pet. Ex. 5 at 1045. Petitioner advised that she "ha[d] noticed some improvement in [her] ambulatory ability and lower extremity sensation" while undergoing plasmapheresis. Id. Dr. Strader recommended monthly plasma exchanges after her current treatment concluded. Id.

On June 5, 2019, Petitioner presented to the ED for a sudden stabbing pain and bleeding at her plasmapheresis port site. Pet. Ex. 5 at 970. She received wound care and was discharged that day. Id. at 969.

On June 7, 2019, Petitioner's spouse called Dr. Strader's office to report that Petitioner was "not doing well," had "no energy," and "only [did] well after the plasma exchanges." Pet. Ex. 5 at 959. He asked if Petitioner could begin weekly plasmapheresis, which Dr. Strader did not recommend because of Petitioner's reaction to fresh frozen plasma. Id. at 943-44, 959-60. Rather, he advised that Petitioner could consider plasmapheresis every three weeks at most. Id. at 944.

On July 5, 2019, Petitioner returned to Dr. Strader. Pet. Ex. 5 at 895-96. Dr. Strader explained that Petitioner's genetic testing results were consistent with CMT1A, but her EMG/NCS and lumbar puncture were "more suggestive of an acquired demyelinating neuropathy." Id. at 896-97. Before significantly changing Petitioner's treatment plan, Dr. Strader recommended additional evaluation to "ascertain whether [Petitioner's] presentation [was] primarily reflective of an acquired demyelinating neuropathy[] or an inherited one." Id. at 896. He referred Petitioner to a neuromuscular clinic to evaluate whether "an additional immunomodulator [was] worth the risk, especially if [they] may be using it to treat what ultimately is [CMT]." Id. Because Petitioner was having port-related issues, Dr. Strader also referred her to interventional radiology for port removal and paused her plasmapheresis. Id.

On July 13, 2019, Petitioner presented to the ED with fever and a headache. Pet. Ex. 5 at 798-99, 804-05. For the first time, Petitioner associated her symptoms with the Tdap vaccination she received in December 2018. Id. at 799. Petitioner's providers indicated a concern for a bloodstream infection, which was thought to have caused Petitioner's recent worsening of symptoms. Id. at 864. Petitioner initially was discharged home but was asked to return later that day after her blood culture result was positive for *Enterobacter cloacae*. Id. at 570, 798, 806. Petitioner received treatment for the bacterial infection at the hospital from July 14 to July 16, 2019. Id. at 515, 570. The hospitalist noted Petitioner had "CIDP/chronic . . . thought to be [CMT] disease." Id. at 570.

On July 25, 2019, Petitioner attended a post-hospitalization visit with Dr. Oligmueller, who noted Petitioner's overall recovery from sepsis and that CIDP "[i]ncrease[d] the risk of infection." Pet. Ex. 5 at 446.

On October 3, 2019, Petitioner saw Dr. Strader, who wrote that Petitioner "return[ed] [] for follow-up of demyelinating neuropathy, with clinical, laboratory, and electrodiagnostic features of [CMT] disease as well as an acquired demyelinating neuropathy such as CIDP." Pet. Ex. 5 at 380, 386. Dr. Strader did not make any adjustments to Petitioner's treatment plan for CIDP/CMT and noted that Petitioner's assessment was ongoing. Id.

On October 24, 2019, Petitioner was evaluated by neuromuscular specialist Vera Fridman, M.D. Pet. Ex. 5 at 321-32. After reviewing Petitioner's history (where Petitioner again reported the temporal proximity between the December 2018 Tdap vaccination and her symptoms of "progressive weakness") and prior workup, Dr. Fridman explained that "while some of the clinical features [were] in keeping with her known diagnosis of [CMT1A], the intermittent exacerbations, [CSF] profile[,] and degree of nerve root enhancement certainly suggest[ed] the possibility of a super-imposed inflammatory neuropathy." Id. at 325-27. "Given [Petitioner's] complex phenotype[,] other inherited diseases that can cause intermittent exacerbations such as mitochondrial disease and porphyria [were] also considered, particularly given the strong [family history] of psychiatric disease." Id. at 326. Dr. Fridman ordered additional blood work "to clarify whether [Petitioner] could have an acquired cause of neuropathy." Id. A repeat EMG/NCS was also ordered. Id. Additionally, Dr. Fridman referred Petitioner to medical genetics "given co-existing CMT, [EDS,] and other congenital features." Id.

On November 6, 2019, Petitioner returned to Dr. Strader. Pet. Ex. 5 at 293. She reported worsening leg weakness, a tight hugging sensation around her torso, tremulousness, migraine headaches with a swelling sensation around her eyes, a burning sensation in her face, and development of "pus pockets" at the margins of her fingernails. Id. at 294. Assessment was "[p]eripheral neuropathy with primarily demyelinating features." Id. at 293. He interpreted Petitioner's lumbar puncture and electrodiagnostic results as "most consistent with an acquired cause such as CIDP." Id. He noted Petitioner had "a mild elevation in titers of GD1b ganglioside antibodies" but that she also had the mutation that caused CMT1A. Id. He did not attribute Petitioner's new symptoms to any existing diagnosis. Id. at 293-94. He ordered thoracic and lumbar spine MRIs "to assess for other causes of lower extremity weakness." Id. at 293. The MRIs, performed on November 18, 2019, were unrevealing. Id. at 241, 263-64. Dr.

Strader concluded that the MRIs did not present "any findings that would explain worsening weakness, other than the known features of CIDP." Id. at 241.

Petitioner's repeat EMG/NCS on November 20, 2019 showed "electrophysiological evidence for severe, chronic, sensorimotor, demyelinating polyneuropathy. The homogeneity of the conduction velocity slowing and absence of acquired demyelinating features (notable asym[m]etry, partial conduction block[,] or temporal dispersion) argue[d] against a coexisting acquired inflammatory demyelinating polyneuropathy, though [did] not fully exclude it." Pet. Ex. 5 at 233-35. After discussion with Dr. Fridman, Petitioner opted to proceed with a three-month IVIG course. Id. Petitioner received IVIG from January 13 to February 10, 2020. Pet. Ex. 66 at 3-20.

Petitioner followed up with Dr. Fridman by video on May 28, 2020. Pet. Ex. 5 at 139. Dr. Fridman explained that "it remain[ed] unclear how much (if at all) a superimposed inflammatory neuropathy [was] affecting [Petitioner's] symptoms at this time," though "[c]ertainly [Petitioner's] prior [CSF] profile and degree of nerve root enhancement suggest[ed] the possibility of a super-imposed inflammatory neuropathy." Id. Dr. Fridman noted that inherited diseases "would still not explain the inflammatory profile on [Petitioner's] CSF." Id. at 140. "Infectious causes and malignancy (both less likely given relapsing remitting symptoms) [were] also considerations." Id. Dr. Fridman felt Petitioner was "clinically stable to improved" and did not believe escalating therapy was needed. Id. She recommended Petitioner follow up with her clinic in six months. Id.

On January 12, 2021, Petitioner followed up with Dr. Strader. Pet. Ex. 5 at 26. He noted Petitioner's primary current symptomatic concern was her ongoing headaches, but that she was still struggling with generalized pain primarily in her legs and the sensation of tightness in her lower extremities. Id. Dr. Strader believed Petitioner's generalized pain syndrome was "possibly related to neuropathy, but also likely with a contribution from [EDS]." Id. at 25. He concluded Petitioner had a "[d]emyelinating peripheral neuropathy with what appear[ed] to be both genetic and acquired features." Id. Petitioner's diagnoses included CIDP and CMT. Id. He did not make any significant changes to Petitioner's treatment plan. Id.

Petitioner's subsequent records through March 2022 relate to her continued treatment. See Pet. Ex. 5 at 1-25; Pet. Ex. 6 at 1-6.

No additional relevant records were filed.

**1. Petitioner's Declarations**

In her affidavit, executed on June 6, 2022, Petitioner averred that she received a Tdap vaccine on December 13, 2018, and "[w]ithin three weeks[,] [she] began feeling pain and tingling in [her] extremities." Pet. Ex. 7 at ¶¶ 3-4. She returned to her provider and was tested for the flu, which was negative. Id. at ¶ 4. Because her symptoms were getting worse, she scheduled an appointment with PA Martin, who started Petitioner on IVIG and referred her to neurologist, Dr. Strader. Id. at ¶¶ 5-6. Petitioner stated "[PA] Martin and Dr. Strader told [her] that [she] had CIDP." Id. at ¶ 7.

Petitioner also executed a declaration, dated May 6, 2024. Pet. Ex. 67 at 3. In it, she described her condition as GBS. Id. at ¶ 8. Petitioner also described her pre-vaccination and post-vaccination condition, explaining that "[s]ince the 2018 vaccination, [she] ha[s] more pain, weakness, and numbness in all of [her] extremities and [her] body" and she "ha[s] little to no energy." Id. at ¶¶ 4-8.

## D. Expert Reports[37]

### 1. Petitioner's Expert, Dr. Carlo Tornatore[38]

#### a. Background and Qualifications

Dr. Tornatore is a board-certified neurologist. Pet. Ex. 18 at 2; Pet. Ex. 19 at 1. He received his M.D. from Georgetown University School of Medicine and subsequently completed a neurology residency at Georgetown University Hospital. Pet. Ex. 18 at 1; Pet. Ex. 19 at 1-2. He completed a post-doctoral fellowship at the National Institutes of Neurologic Disorders and Stroke at the National Institutes of Health. Pet. Ex. 18 at 1; Pet. Ex. 19 at 2. Dr. Tornatore then joined the faculty at Georgetown. Pet. Ex. 18 at 2; Pet. Ex. 19 at 2. He is currently a Professor and Chairman of the Department of Neurology at Georgetown University Medical Center; Chairman and Neurologist-in-Chief of the Department of Neurology at Medstar Georgetown University Hospital; Physician Executive Director for Neurology for the Medstar Health System; and the Director of the MS Center at Georgetown. Pet. Ex. 18 at 1-2; Pet. Ex. 19 at 2-3. At the MS Center, he follows patients with inflammatory neuropathies, myopathies, and disorders of the neuromuscular junction. Pet. Ex. 18 at 2. He has "cared for several hundred patients with acute and post-acute [GBS] over [his] career." Id. He also serves as an ad hoc reviewer for five medical journals and has authored or co-authored numerous publications on neurology over the course of his career. Pet. Ex. 19 at 5-14.

#### b. Opinion

Dr. Tornatore opined "to a reasonable degree of medical probability that a Tdap vaccine precipitated GBS/inflammatory neuropathy in [Petitioner], an individual with [CMT1A], a hereditary demyelinating disorder that predisposes to an inflammatory demyelinating neuropathy." Pet. Ex. 57 at 1.

##### i. Diagnosis

In his expert reports, Dr. Tornatore referred to Petitioner's post-vaccination injury as GBS and as an "inflammatory neuropathy." See, e.g., Pet. Ex. 18 at 3 ("At issue in this case is

---

[37] Although the undersigned has reviewed all the expert reports and medical literature, for the sake of brevity this Ruling does not include all details of the experts' opinions. Instead, the undersigned focuses on the experts' material opinions, as they relate to the relevant issues.

[38] Dr. Tornatore provided two expert reports. Pet. Exs. 18, 57.

whether a Tdap vaccination [Petitioner] received on 12/13/2018 resulted in an episode of inflammatory neuropathy."), 13 (addressing "whether the Tdap vaccination that [Petitioner] received on 12/13/2018 precipitated an episode of GBS"); Pet. Ex. 57 at 1 (opining the "Tdap vaccine precipitates GBS/inflammatory neuropathy"). Dr. Tornatore does not explain the reasoning for his diagnosis of GBS.

He agreed Petitioner's CMT1A and CMT1A-related degeneration of the peripheral nerves pre-dated vaccination. Pet. Ex. 18 at 13-14; Pet. Ex. 57 at 1. Her CMT1A, according to Dr. Tornatore, would have resulted in myelin impairment and deterioration. Pet. Ex. 18 at 2. His position was that her CMT1A gave her a "propensity" or made her "more susceptible" for inflammatory demyelinating peripheral neuropathies; he did not opine her CMT1A caused her alleged vaccine-related injury. Id. at 2, 16-17; Pet. Ex. 57 at 10 (concluding her CMT1A "predisposed [her] to an inflammatory neuropathy").

In response to Respondent's expert, Dr. Jamieson, who opined that Petitioner's post-vaccination diagnosis was more likely than not CIDP and not GBS, Dr. Tornatore wrote, "We are also in agreement that [Petitioner] had intermittent episodes of an inflammatory demyelinating neuropathy superimposed on [her] CMT1A." Pet. Ex. 57 at 1-2. Dr. Tornatore did not opine Petitioner had CIDP, but did explain the similarities between GBS/AIDP and CIDP, concluding "the immunopathogenesis of GBS and CIDP are quite similar and frequently indistinguishable and that learnings from one disease state can inform our understanding of these comparable disease states." Id. at 2-4.

### ii. Althen Prong One[39]

Dr. Tornatore opined the Tdap vaccine can cause GBS via molecular mimicry in a susceptible individual. Pet. Ex. 18 at 15, 26. He asserted molecular mimicry is "a biologically sound explanation to understand Tdap-related GBS." Id. at 31.

He cited the 1994 Institute of Medicine ("IOM") report,[40] which stated "it is biologically plausible that injection of an inactivated virus, bacterium, or live attenuated virus might induce in the susceptible host an autoimmune response" via mechanisms including molecular mimicry. Pet. Ex. 29 at 65. As to vaccines containing tetanus toxoid and GBS specifically, the 1994 IOM

[39] The undersigned provides only a brief summary of Dr. Tornatore's opinions on Althen prong one as the undersigned's Decision does not turn on prong one. Additionally, despite Dr. Tornatore contending that "the pathogenic mechanisms that are implicated in post-[flu] vaccine GBS cases can inform [the] thinking [here]," the undersigned disagrees as the flu vaccine and Tdap vaccine are distinct and contain different antigens and different components. For more on these opinions and supportive literature, see Pet. Ex. 18 at 26-37; Pet. Ex. 57 at 7-10.

[40] Inst. of Med., Adverse Events Associated with Childhood Vaccines: Evidence Bearing on Causality (Kathleen Stratton et al. eds., 1994).

Report concluded "[t]he evidence favors a causal relation." Id. at 106. The 2012 IOM Report[41] concluded "[t]he evidence is inadequate to accept or reject a causal relationship between diphtheria toxoid–, tetanus toxoid–, or acellular pertussis–containing vaccines" and GBS and CIDP. Pet. Ex. 30 at 587, 589. Dr. Tornatore opined it was "[s]ignificant[]" that the 2012 IOM report did not "reject[]" a causal relationship and instead "adopted a neutral stance given the high bar set by the methodology to either accept or reject a thesis." Pet. Ex. 18 at 19. He also maintained the 2012 IOM Report did not identify any new evidence to refute the conclusions in the 1994 IOM Report or otherwise explicitly critique the 1994 IOM Report; the 2012 IOM Report "simply disagreed that the evidence considered went beyond temporality." Id.

As to the specifics of his theory, Dr. Tornatore opined that myelin protein P2, which has been shown to be a target in GBS,[42] shares similarities (homology) with the tetanus toxin as well as the diphtheria toxin. Pet. Ex. 18 at 31-32, 34-37. He further opined this homology "would strongly suggest that epitopes from [the tetanus and diphtheria toxins] that bear resemblance to P2[] can induce an inflammatory response to the myelin of the peripheral nervous system, i.e. evidence that molecular mimicry can be the pathogenesis of" GBS post-Tdap vaccination. Id. at 33, 37. And he proposed that in individuals with CMT1A, who already have a hereditary breakdown of their myelin sheath, the Tdap vaccination can "act[] in a synergistic manner" and precipitate GBS. Id. at 37; see also id. at 18 (opining there is "compelling data" showing "an immune response to PMP22 can result in an autoimmune inflammatory demyelinating disorder in patients with CMT1A").

Dr. Tornatore also opined that the wild tetanus disease is associated with peripheral neuropathies, including GBS. Pet. Ex. 18 at 34. He cited to the 2012 IOM Report, which indicated "the effects of [] natural infection [represents] one type, albeit minor, of clinical or biological evidence in support of mechanisms." Id. (quoting Pet. Ex. 30 at 42).

Dr. Tornatore also cited Lee et al.,[43] a retrospective study of patients diagnosed with generalized tetanus who were admitted to a hospital in South Korea between January 2000 and

---

[41] Inst. of Med., Adverse Effects of Vaccines: Evidence and Causality (Kathleen Stratton et al. eds., 2012). This was also cited as Resp. Ex. A-29.

[42] See, e.g., Pet. Ex. 51 (H.R. Inglis et al., Antibody Responses to Peptides of Peripheral Nerve Myelin Proteins PO and P2 In Patients with Inflammatory Demyelinating Neuropathy, 78 J. Neurol. Neurosurg. & Psychiatry 419 (2007) (also filed as Pet. Ex. 58). Inglis et al. also noted "[p]revious studies have found antibodies to the peripheral myelin proteins P2, P0[,] and PMP22 . . . in the sera of some, but not all, patients with GBS and CIDP." Id. at 1; see also Pet. Ex. 21 at 9 (noting "anti-PMP22 antibodies are found in a significant proportion of patients with CIDP or [GBS]," while "[o]nly a minority of patients with CMT1A have these antibodies"); Pet. Ex. 28 at 1 (C.M. Gabriel et al., Anti-PMP22 Antibodies in Patients with Inflammatory Neuropathy, 204 J. Neuroimmunol. 139 (2000)) ("conclud[ing] that an immune response against PMP22 may play a role in the pathogenesis of the inflammatory neuropathies"); Pet. Ex. 65 at 5.

[43] Jae Hoon Lee et al., Generalized Tetanus Could be Complicated with Guillain-Barré Syndrome, 48 Int'l J. Infect. Dis. 20 (2016). This was also filed as Resp. Ex. A-45.

December 2015 to evaluate the occurrence of GBS. Pet. Ex. 18 at 34 (citing Pet. Ex. 55 at 1). Of the 13 patients diagnosed with tetanus, two were also diagnosed with GBS, with onset periods of eight and 23 days after the onset of tetanus infection. Pet. Ex. 55 at 1-2. Dr. Tornatore asserted that "[g]iven the rarity of both tetanus disease and GBS, it was felt to be highly unlikely that these were chance occurrences." Pet. Ex. 18 at 34. While Lee et al. did not specifically state that the tetanus infection caused GBS in these two patients, the authors concluded that "generalized tetanus can be complicated with GBS" and "physician[s] should keep in mind that GBS could be an important cause of muscle weakness in patients with tetanus." Pet. Ex. 55 at 1-2.

Lastly, Dr. Tornatore cited literature he purported showed an association between the Tdap vaccine and GBS. Pet. Ex. 18 at 20-25 ("In aggregate, these case series and case reports support the thesis that tetanus toxoid-containing vaccines can rarely precipitate GBS, an autoimmune neuropathy, and offer immunologically appropriate mechanisms."). For example, Yih et al.[44] assessed the safety of the Tdap vaccine in subjects aged 10-64 from 2005 to 2008. Pet. Ex. 31 at 1. Although the highest observed relative risk was for GBS, the authors found no evidence of an association between Tdap and GBS or that Tdap increases the risk of GBS above the background rate. Id. at 4-5.

Top et al.[45] examined data from Canadian pediatric tertiary care centers and found 246 cases of GBS from 1996 to 2012. Pet. Ex. 32 at 1. Twenty-four (10%) developed GBS within four to 30 days (median: 18 days) following a vaccination and were included in the authors' "[p]ostvaccine" cases; 222 developed GBS more than 30 days post-vaccination and were referred to as the "[n]onvaccine-associated" cases. Id. at 1-2. Vaccines administered among the post-vaccine group included tetanus toxoid-containing vaccines, with nine individuals receiving a tetanus toxoid-containing vaccine. Id. at 2. The authors concluded "postimmunization GBS is rare in children." Id. at 3. They reported most of their post-vaccination cases, which were the cases within onset within 30 days, also presented with symptoms suggestive of recent infection, with some having a microbiologically confirmed infection, which the authors "suggest[ed] an alternate etiology for their GBS." Id. at 2. They further concluded that "[t]he high frequency of symptoms of recent infection suggest[ed] that a temporal association between vaccination and GBS onset [was] most likely coincidental rather than causal." Id. at 3.

---

[44] W. Katherin Yih et al., An Assessment of the Safety of Adolescent and Adult Tetanus-Diphtheria-Acellular Pertussis (Tdap) Vaccine, Using Active Surveillance for Adverse Events in the Vaccine Safety Datalink, 27 Vaccine 4257 (2009). This was also filed as Resp. Exs. A-30, C-2.

[45] Karina A. Top et al., Guillain-Barré Syndrome After Immunization in Canadian Children (1996-2012), 34 Pediatr. Infect. Dis. J. 1411 (2015). This was also filed as Resp. Ex. A-37.

Dr. Tornatore next cited Kongbunkiat et al.,[46] a report of four cases of GBS following diphtheria and tetanus vaccination in Thailand. Pet. Ex. 33 at 1. Two cases developed GBS four weeks after their second diphtheria and tetanus dose, one developed GBS five weeks after his second diphtheria and tetanus dose, and one developed GBS four months after his first diphtheria and tetanus dose. Id. at 2. The authors noted the "main mechanism" of GBS "is an immune-mediated process resulting in peripheral nerve destruction from autoantibodies" and "[v]accination is believed to stimulate the immune system and cause autoantibodies against peripheral nerves." Id. at 6. However, the authors made no findings as to causation in their cases.

In Chang et al.,[47] the authors analyzed 2,090 Vaccine Adverse Event Reporting System ("VAERS") reports to assess adverse events post-Tdap vaccination from May 2005 to June 2007. Pet. Ex. 34 at 1. There were 10 cases of GBS, with a median onset of 25 days (range: 1-56 days), and three of the 10 reported pre-vaccination histories of upper respiratory infection or flu-like illnesses. Id. at 3. The authors noted "many cases are preceded by respiratory or gastrointestinal infections." Id. at 5. And though "the exact cause of GBS is still unknown," they hypothesized "[a]n autoimmune response triggered by vaccine components might play a role in the development of GBS in susceptible individuals." Id. The authors noted that "[d]ue to inherent limitations of passive surveillance systems, temporal associations between reported [adverse events] and vaccines must be interpreted with caution. Clear causality usually cannot be inferred." Id. The authors did not make any findings or conclusions as to causation in their cases.

Pollard and Selby[48] reported a patient who suffered three episodes of a demyelinating neuropathy, characteristic of GBS/AIDP, and each episode occurred after a tetanus toxoid vaccination with onset periods of three weeks, two weeks, and 10 days. Pet. Ex. 26 at 1-2. The authors had "little doubt" that all three episodes resulted from vaccination. Id. at 5. They also opined "[t]he pathological and immunological studies in [their] patient indicate[d] that similar pathogenetic mechanisms are involved in the demyelination seen in [] post-inoculation polyneuropathy as in the more usual post-infective variety." Id. at 6.

---

[46] Kannikar Kongbunkiat et al., Clinical Manifestations and Outcomes of Guillain-Barré Syndrome After Diphtheria and Tetanus Vaccine (dT) During a Diphtheria Outbreak in Thailand: A Case Series, 19 Neurol. Asia 137 (2014). This was also filed as Resp. Ex. A-38.

[47] Soju Chang et al., U.S. Postlicensure Safety Surveillance for Adolescent and Adult Tetanus, Diphtheria and Acellular Pertussis Vaccines: 2005–2007, 31 Vaccine 1447 (2013). This was also filed as Pet. Ex. 62 and Resp. Ex. A-28.

[48] J.D. Pollard & G. Selby, Relapsing Neuropathy Due to Tetanus Toxoid: Report of a Case, 37 J. Neurol. Scis. 113 (1978). This was also filed as Pet. Ex. 61 and Resp. Ex. A-33.

Dr. Tornatore also cited literature, including Pritchard et al.[49] and Hughes et al.,[50] to show an increased risk of CIDP following tetanus vaccination has been reported. Pet. Ex. 18 at 24 (citing Pet. Exs. 38, 41). In Pritchard et al., patients in the British GBS Support Group were asked to complete questionnaires identifying all vaccinations they received since their GBS or CIDP diagnosis and describing any symptoms they experienced within six weeks of vaccination that would be "suggestive of recurrence of GBS or worsening of CIDP." Pet. Ex. 38 at 1. Of the 927 patients with GBS that completed the questionnaire, 311 had received a vaccination since diagnosis, with 11 reporting symptoms post-vaccination, though none required hospitalization or treatment. Id. Of those 311, 29 received a vaccine in the six weeks before the onset of their initial illness, and two of the 29 had a recurrence of symptoms after subsequent, different vaccinations. Id. Of the 179 CIDP patients who completed the questionnaire, 65 had received a vaccination since disease diagnosis, with five reporting worsening neurological symptoms post-vaccination. Id. Three of the five patients had symptoms similar to a typical relapse of CIDP; one required treatment within two months and the other two were experiencing mild neurological symptoms at the time of vaccination. Id. Two of the five CIDP patients who had a relapse after vaccination received a tetanus vaccine; none of the five received a diphtheria vaccination. Id. at 1-2. The authors concluded their "greatest concern [was] the risk of relapse following tetanus toxoid" in CIDP patients, though they acknowledged the "difficulties in drawing conclusions from [] questionnaire[s]" completed by patients.[51] Id. at 2.

In Hughes et al., the authors identified two cases of their 110 patients with CIDP or recurrent GBS, that had "a possible temporal relationship" between vaccination and relapse. Pet. Ex. 41 at 4-5. The first case was a 59-year-old male who first developed GBS following a flu-like illness and then developed a recurrence of GBS following a flu-like illness and cholera, yellow fever, and tuberculosis immunizations. Id. at 5. The second case was a male who developed GBS two weeks after a tetanus toxoid vaccination at the age of 27 and developed recurrences at ages 48 and 52 after further tetanus vaccinations. Id. Hughes et al. explained that "[t]he rarity of reports of recurrence of GBS or relapse of CIDP following immunization suggests that the risk of relapse following immunization is very low and this advice may be overcautious;" however, patients are still advised to defer immunization for the first year of disease onset due to "residual uncertainty." Id. The authors do not reach any causal conclusions for their two patients.

---

[49] J. Pritchard et al., Risk of Relapse of Guillain-Barré Syndrome or Chronic Inflammatory Demyelinating Polyradiculoneuropathy Following Immunization, 73 J. Neurol. Neurosurg. & Psychiatry 348 (2002). This was also filed as Resp. Ex. A-39.

[50] Richard A.C. Hughes et al., Immunization and Risk of Relapse of Guillain-Barré Syndrome or Chronic Inflammatory Demyelinating Polyradiculoneuropathy,19 Muscle & Nerve 1230 (1996). This was also filed as Resp. Ex. A-41.

[51] "It is intuitively likely that more patients who experienced symptoms following immunization responded to the questionnaire, which would overestimate the frequency of relapses. Consequently, the true risks of relapse following immunisations after GBS or in CIDP may be less than those discovered in this audit." Pet. Ex. 38 at 2.

Dr. Tornatore relied upon the authors' statement that patients who developed their disease within 12 weeks of vaccination, "especially with tetanus toxoid," should not receive the same vaccination again as they "may" be at a high risk of relapse. Pet. Ex. 18 at 24-25 (quoting Pet. Ex. 41 at 5). He relied upon this data to conclude GBS is recognized to be precipitated by tetanus-containing vaccines. Id. at 25.

### iii. Althen Prong Two

Dr. Tornatore opined that Petitioner's Tdap vaccination, via molecular mimicry, led to an "acute synergistic inflammatory cascade" which resulted in GBS/AIDP. Pet. Ex. 18 at 37-38. He summarized that "[t]he immune system recognized epitopes on the Tdap vaccine . . . that bore homology to epitopes in peripheral myelin," and "[t]his homology resulted in a misdirected autoimmune response to peripheral myelin elements," causing Petitioner's GBS/AIDP. Id.

Dr. Tornatore provided a detailed pre-vaccination and post-vaccination medical history for Petitioner. See Pet. Ex. 18 at 3-13. Of note, Petitioner had "[two] overlapping neurologic issues" prior to the vaccination at issue: (1) "[a] hereditary demyelinating disorder of the peripheral motor and sensory nerves diagnosed as [CMT] disease, specifically CMT1[A];" and (2) "[r]elapses of inflammatory demyelination of the peripheral motor and sensory nerves." Pet. Ex. 18 at 2.

Symptoms related to CMT1A "usually occur[] in the first two decades of life and subsequently show[] a slow progression over decades." Pet. Ex. 18 at 3 (quoting Pet. Ex. 20 at 1). He hypothesized Petitioner's CMT1A symptoms "probably bec[a]me evident during her teenage years" or in 2006. Id. at 3, 14. Thus, Petitioner first exhibited injury to her peripheral nerves/myelin 13 years prior to the Tdap vaccination at issue. Id. at 14.

Dr. Tornatore next explained that "the metabolic/structural changes caused by CMT1A made the peripheral nerves more susceptible to autoimmune demyelination," and therefore Petitioner "had a propensity for inflammatory demyelination of the peripheral motor and sensory nerves." Pet. Ex. 18 at 2. For support, he cited articles to show "CMT1A predispose[d] [Petitioner] to a subsequent to inflammatory demyelinating neuropathy." Id. at 16-18 (citing Pet. Ex. 21; Pet. Ex. 27 (describing two children with CMT1A and a superimposed AIDP); Pet. Ex. 28).

In Ginsberg et al., the authors examined seven patients with CMT1A and co-existent inflammatory neuropathies and concluded "there is accumulating evidence for a super inflammatory process in a subgroup of patients with CMT." Pet. Ex. 21 at 1, 8-9. The seven patients examined "had an atypical phenotype for CMT [], suggesting a superimposed inflammatory neuropathy." Id. at 2. All seven also had "a history of stepwise deterioration with acute or subacute relapses after periods of clinical stability; this would be most unusual for a classical inherited neuropathy." Id. at 7. The authors explained that it would be difficult to discern EMG/NCS evidence of an acquired inflammatory demyelinating process from already present evidence due to the inherited CMT. Id. at 8 (adding "the degree of slowing typically seen in CMT1 effectively precludes many of the electrophysiological criteria used in the diagnosis of CIDP"). Though "[s]ome of the neuropathological findings in [their] CMT1A

patients suggest[ed] a superimposed inflammatory process," the authors cautioned against overinterpreting the data. Id. The authors concluded that there is "a relatively small proportion of CMT patients with coexistent inflammation," or alternatively, that there is "a subgroup of CMT patients [] predisposed to superimposed inflammation." Id. at 9.

Lastly, Dr. Tornatore asserted there was no documented alternate cause. Pet. Ex. 57 at 10. He acknowledged that Petitioner "had concurrent upper respiratory symptoms" at the time of vaccination, but contended she was not febrile and did not have any other symptoms suggestive of an active infection. Pet. Ex. 18 at 37. He noted Petitioner's reports of a flu-like illness during a visit on January 25, 2019, and her subsequent diagnosis and treatment for the flu at that visit, but he does not address the impact on Petitioner's condition. See id. at 8, 37; Pet. Ex. 57 at 6.

#### iv. Althen Prong Three

Dr. Tornatore opined that Petitioner's "GBS-related symptoms" began three weeks to 42[52] days/six weeks post-vaccination, which is "a time frame that is consistent with a vaccine/immune-mediated injury to the peripheral nervous system." Pet. Ex. 57 at 6; Pet. Ex. 18 at 38.

As to the date of onset, Dr. Tornatore identified three relevant dates. The first is based on Petitioner's affidavit, which indicated pain and tingling in extremities within three weeks of vaccination. Pet. Ex. 57 at 6 (citing Pet. Ex. 7 at 1).

Second, he cited to Petitioner's report of a one-day history of myalgias and upper respiratory symptoms on January 25, 2019, 43 days post-vaccination. Pet. Ex. 57 at 6 (citing Pet. Ex. 5 at 1592-93). Even though rapid flu A and B tests were negative on January 25, Petitioner was diagnosed and treated for the flu. Pet. Ex. 5 at 1593, 1595. Neurologic symptoms were not reported or documented at this visit. Dr. Tornatore does not explain how upper respiratory symptoms and/or the flu are manifestations of GBS.

Then, on February 20, 2019, 69 days post-vaccination, Dr. Tornatore opined Petitioner related her symptoms, which she characterized as "GBS like," to her recent flu infection in January 2019. Pet. Ex. 57 at 6 (citing Pet. Ex. 5 at 1569-71). Specifically, history of present illness from this visit wrote, "[Petitioner] said she had the flu recently. Since then[,] she is feeling tired all over. She is having weakness in her arms. . . . She says her symptoms feel like GBS like." Pet. Ex. 5 at 1573. It appears Dr. Tornatore infers that the arm weakness described on February 20, 2019 had been present since Petitioner had the flu, which began on January 24, 2019. And thus, he placed onset of Petitioner's neurologic condition on January 24, 2019. Dr. Tornatore does not acknowledge or address the lack of neurological complaints at the January 25, 2019 visit. Neither does he acknowledge that the February 20, 2019 history of present illness relates Petitioner's fatigue to her flu infection.

---

[52] Though Dr. Tornatore uses 41 days, or January 24, 2019, as the maximum onset period, January 24 is 42 days post-vaccination. Thus, the undersigned will use 42 days or six weeks.

In support of his opinion that this timing is appropriate, Dr. Tornatore cited Schonberger et al.,[53] who reported an increased risk of GBS in the five-week period post-flu vaccination. Pet. Ex. 18 at 38 (citing Pet. Ex. 25). The Tdap vaccine or tetanus- or diphtheria-containing vaccines were not discussed in Schonberger et al.

Some of Dr. Tornatore's literature addresses onset. The cases in Top et al. that were placed in the "[p]ostvaccine" group had an onset of GBS between four to 30 days; cases with an onset greater than 30 days were placed in "[n]onvaccine-associated" group. Pet. Ex. 32 at 1-2. The onset interval range in the 10 GBS cases in Chang et al. was one to 56 days. Pet. Ex. 34 at 3, 3 tbl. 3. And Pritchard et al. only examined symptoms up to six weeks following vaccination. Pet. Ex. 38 at 1. None of these studies support an onset of 69 days, or 10 weeks.

Dr. Tornatore also cited case reports of GBS following tetanus-containing vaccinations. Pet. Ex. 18 at 22. Hughes et al. identified a patient who developed GBS two weeks after a tetanus toxoid vaccination and had two recurrences after further tetanus vaccinations. Pet. Ex. 41 at 5. Newton and Janati[54] reported GBS in a 47-year-old male nine days after vaccination with pure tetanus toxoid. Pet. Ex. 35 at 1. Bakshi and Graves[55] discussed a 22-year-old patient who developed GBS four days after a tetanus-diphtheria vaccination. Pet. Ex. 36 at 1. Because there were previous case reports of GBS following administration of pure tetanus toxoid vaccines, the authors "suspect[] that the tetanus portion of the vaccination produced the GBS, but [they] [could not] offer proof." Id. at 2. And in Ammar,[56] a 40-year-old male received a Tdap vaccination after a fall, and a week and a half later began experiencing symptoms consistent with GBS. Pet. Ex. 37 at 1. Ammar did not provide any opinions as to causation but noted that the Tdap vaccine was the only recognized antecedent event in this case. Id. at 2. And the patient in Pollard and Selby developed GBS three times following vaccination with tetanus toxoid, with onset periods of three weeks, two weeks, and 10 days post-vaccination. Pet. Ex. 26 at 1-2. Overall, these case reports report an onset of GBS between four days and three weeks following vaccination, and none support an onset of 69 days or 10 weeks.

---

[53] Lawrence B. Schonberger et al., Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977, 110 Am. J. Epidemol. 105 (1979).

[54] Norris Newton & Abdorassol Janati, Guillain-Barré Syndrome After Vaccination with Purified Tetanus Toxoid, 80 S. Med. J. 1053 (1987). This was also filed as Resp. Ex. A-34.

[55] Rohit Bakshi & Michael C. Graves, Guillain-Barré Syndrome After Combined Tetanus-Diphtheria Toxoid Vaccination, 147 J. Neurol. Scis. 201 (1997). This was also filed as Resp. Ex. A-35.

[56] Hussam Ammar, Guillain-Barré Syndrome After Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine: A Case Report, 5 J. Med. Case Reps. 1 (2011). This was also filed as Resp. Ex. A-36.

### 2. Respondent's Expert, Dr. Dara G. Jamieson[57]

#### a. Background and Qualifications

Dr. Jamieson is a board-certified neurologist. Resp. Ex. B at 2. She received her medical degree from the University of Pennsylvania, followed by a neurology residency and a cerebrovascular fellowship at the University of Pennsylvania Hospital. Id. at 1. Dr. Jamieson was a practicing neurologist for 32 years before transiting to a teaching appointment. Resp. Ex. A at 1. She is currently a Clinical Associate Professor of Neurology at Weill Cornell Medicine, where she teaches medical students, residents, and fellows. Id. Dr. Jamieson has lectured extensively on multiple neurological topics. Id. at 2; Resp. Ex. B at 4-10. She serves as an editor and reviewer for several neurology journals, is an active member of multiple neurology organizations, and has authored or co-authored numerous neurology papers, chapters, review articles, and books. Resp. Ex. A at 1-2; Resp. Ex. B at 10-15.

#### b. Opinion

Dr. Jamieson opined Petitioner's Tdap vaccination "did not cause or exacerbate her peripheral nerve symptoms, which were due to her long standing, pre-existing chronic peripheral nerve disease that predated [] vaccination." Resp. Ex. E at 1.

##### i. Diagnosis

Dr. Jamieson opined, more likely than not, Petitioner did not have GBS/AIDP due to her "history of repetitive episodes with intervening and continuing weakness and sensory symptoms." Resp. Ex. A at 21-22, 26. She opined CIDP would better explain these "long-standing, relapsing and remitting symptoms." Id. at 26. The diagnosis of CIDP was also made by Petitioner's treating neurologists, Dr. Strader and Dr. Fridman, which Dr. Jamieson took into account. Id.

While Dr. Tornatore opined GBS and CIDP are similar and frequently indistinguishable, Dr. Jamieson disagreed and opined "GBS and CIDP[] are distinct and different diseases with both overlapping and disparate clinical and immunological characteristics." Resp. Ex. E at 2-5; see also Resp. Ex. A at 14-15. She explained that "[t]he rapidly evolving, one-time, clinical presentation of AIDP differs from CIDP, which is an indolent, immune-mediated demyelinating peripheral neuropathy with diverse clinical presentations." Resp. Ex. A at 14. For example, the initial symptoms of CIDP progress slowly over more than eight weeks or two months before reaching nadir, while GBS/AIDP takes less than four weeks to reach nadir. Id. She

---

[57] Dr. Jamieson provided two expert reports. Resp. Exs. A, E.

acknowledged some signs and symptoms overlap, but maintained there are key clinical, pathophysiological, treatment, and prognosis differences.[58] Id. at 14-15.

Dr. Jamieson also noted that CIDP is often misdiagnosed as "recurrent GBS," which occurred in Petitioner's case, and she opined CIDP was "more consistent" with Petitioner's clinical course and the "more likely than not" diagnosis here. Resp. Ex. A at 3, 7, 15, 21, 26; see also Resp. Ex. A-9 (comparing acute CIDP and recurrent GBS).

Dr. Jamieson appeared to agree with and/or defer to Petitioner's treating neurologists that Petitioner may have had two overlapping diagnoses, CMT1A and CIDP. Resp. Ex. A at 26-27. "Both CMT1A and CIDP are demyelinating peripheral neuropathies that can occur in the same individual." Id. at 21. Although Petitioner's CSF findings were indicative of CIDP, she did not respond to treatment typical for CIDP, which Dr. Jamieson opined "may indicate that she had CMT1A without CIDP or that she had a CIDP-mimic such as an autoimmune nodopathy."[59] Id. at 27.

Regardless of whether Petitioner has one or two chronic demyelinating peripheral neuropathies (i.e., CMT1A alone or in combination with CIDP), Dr. Jamieson opined the Tdap vaccination did not cause or exacerbate her condition. Resp. Ex. A at 22, 27-28; see also Resp. Ex. E at 1-2 (opining "[Petitioner] had episodic worsening of her motor and sensory symptoms in . . . 2019 due to demyelination related to CIDP and/or her baseline diagnosis of CMT1A"). Dr. Jamieson explained that resolving the debate as to whether Petitioner has one of two demyelinating peripheral neuropathies is "immaterial" to this matter, "as the onset of her symptoms was remote from any association with the Tdap vaccination." Resp. Ex. A at 22.

### ii. Althen Prong One

Dr. Jamieson opined there is no evidence of a causal link between Tdap vaccination and a demyelinating peripheral neuropathy like GBS/AIDP and CIDP. Resp. Ex. A at 20, 28; Resp. Ex. E at 5-6.

---

[58] For more detailed differences between GBS and CIDP, see Resp. Ex. A at 12-15; Resp. Ex. E at 2-5. Because the undersigned's Decision does not turn on whether CIDP is distinct from GBS or whether CIDP is the chronic version of GBS, the undersigned does not summarize the experts' opinions and literature on these questions.

[59] Autoimmune nodopathies are associated with antibodies against nodal-paranodal cell-adhesion molecules (e.g., contactin-1, neurofascin -155, contactin-associated protein 1, and neurofascin isoforms) that are not classified as CIDP due to their distinct clinical features, no overt inflammation or macrophage-mediated demyelination, and poor response to CIDP treatment (IVIG in particular). Resp. Ex. A-11 at 5. Dr. Jamieson acknowledged that Petitioner's medical records do not show Petitioner was tested for the presence of nodal/paranodal antibodies. Resp. Ex. A at 16. Thus, even though she contends "[a]n autoimmune nodopathy is a diagnostic consideration," the undersigned finds this testimony lacks preponderant supportive evidence. Id.

She addressed Dr. Tornatore's medical literature but otherwise did not address his purported mechanisms or homology and left those discussions to Dr. Moy. See Resp. Ex. A at 16-26.

Regarding Dr. Tornatore's medical literature, Dr. Jamieson opined "there is no medical literature, either epidemiological or case studies, that supports a causation argument that Tdap vaccine causes GBS." Resp. Ex. A at 22. "A few isolated case reports spanning almost three decades and descriptive epidemiological studies that have shown no correlation do not support causation." Id. at 28. For support, she analyzed Dr. Tornatore's literature and concluded none supported a finding that the Tdap vaccine can cause GBS or CIDP.[60] See id. at 16-20, 22-25 (citing Pet. Exs. 26, 29-38, 41); see also Resp. Ex. E at 5-6 (opining that a causal association between the Tdap vaccine and GBS or CIDP is "unsupported").

Dr. Jamieson also cited to Souyah et al.[61] and Tuttle et al.[62] for further evidence against an association between the Tdap vaccine and GBS.[63] Resp. Ex. A at 17-18 (citing Resp. Exs. A-31, A-32). In Souyah et al., the authors used VAERS data[64] from 1990 to 2005 to determine the risk of GBS post-vaccination. Resp. Ex. A-31 at 1. Of the 1,000 cases of GBS, 774 has onset of GBS within six weeks of vaccination, 101 had an onset period greater than six weeks, and the onset period was unknown in 125 cases. Id. Tetanus and diphtheria toxoid vaccines were the third most frequently reported to be administered prior to GBS onset (32 cases), with 88% (28/32) occurring within six weeks of vaccination, 6% (2/32) occurring after six weeks, and 6% (2/32) with an unknown time interval. Id. at 2 tbl. 1, 3. The authors concluded "[their] results suggest[ed] that vaccines other than [the] [flu] vaccine can be associated with GBS;" however, due to their lack of control group and the fact that they used data from a passive surveillance system, the authors stressed "further controlled studies are needed to confirm the association of GBS with vaccines other than [the] [flu] vaccine." Id. at 5. The authors noted their data showed

---

[60] This literature was discussed above in Dr. Tornatore's expert report section and is therefore, not repeated here. See supra Section II.D.1.b.ii.

[61] Nizar Souayah et al., Guillain-Barré Syndrome After Vaccination in United States: Data from the Centers for Disease Control and Prevention/Food and Drug Administration Vaccine Adverse Event Reporting System (1990–2005), 11 J. Clin. Neuromusc. Dis. 1 (2009).

[62] Jessica Tuttle et al., The Risk of Guillain-Barré Syndrome After Tetanus-Toxoid-Containing Vaccines in Adults and Children in the United States, 87 Am. J. Pub. Health 2045 (1997).

[63] At the time of the Souyah et al. and Tuttle et al. studies, the Tdap vaccine was not yet FDA approved, and thus was not included. See Diphtheria, Tetanus, and Pertussis Vaccine Safety, Ctrs. of Disease Control & Prevention, Jan. 31, 2025, https://www.cdc.gov/vaccine-safety/vaccines/dtap-tdap.html. (noting Tdap was FDA approved in 2005).

[64] Because VAERS is a passive surveillance system, it is subject to limitations including "underreporting, differential reporting, ascertainment bias, and variability in report quality and completeness." Resp. Ex. A-31 at 5.

GBS cases reached baseline at six weeks post-vaccination; thus, they did not study or analyze the cases of GBS that occurred more than six weeks post-vaccination. See id. at 3, 4 fig. 1.

Tuttle et al. examined the risk of GBS following tetanus-toxoid-containing vaccines based on previous active surveillance epidemiological studies. Resp. Ex. A-32 at 1. The authors' analysis revealed no increased risk of GBS in adults or children withing six weeks of a tetanus-toxoid-containing vaccine. Id. at 3. They further noted that the number of GBS cases after administration of tetanus-toxoid-containing vaccines in children and adults was less than the number of cases of GBS by chance alone. Id. at 4.

### iii. Althen Prongs Two and Three

Dr. Jamieson opined the Tdap vaccination did not cause or exacerbate Petitioner's CIDP, condition, or neuropathic symptoms. Resp. Ex. A at 23, 25, 27-28. As discussed above, she opined the medical literature does not support a finding that Petitioner's Tdap vaccine caused her "condition" or "neuropathic symptoms." Id. at 23, 25. She explained that the timing between vaccination and onset was too remote and "precludes a logical cause and effect correlation." Id. at 26.

Like Dr. Tornatore, Dr. Jamieson detailed Petitioner's pre- and post-vaccination medical history. See Resp. Ex. A at 2-11. She agreed Petitioner had numerous overlapping pre-vaccination conditions. Id. at 27. Petitioner's neurologic history, according to Dr. Jamieson, was consistent with what is seen with CMT1A. Id. at 21. Dr. Jamieson also opined that Petitioner's pre-vaccination episodes of GBS in 2008 and 2012 were likely CIDP, not GBS, meaning Petitioner had CIDP prior to the vaccination at issue here.[65] Id. at 20-21; see also Resp. Ex. E at 8 ("Prior to her Tdap vaccination, [Petitioner] had either one (i.e., CMT1A) or two (i.e., CMT1A and CIDP) chronic peripheral demyelinating neuropathies to explain her periodic exacerbation in her baseline weakness and sensory symptoms . . . .").

Petitioner received her Tdap vaccination on December 13, 2018, while she had acute bronchitis. Resp. Ex. A at 20, 27. She then complained of worsening neuropathy symptoms when she was seen on February 20, 2019, 69 days post-vaccination. Id. at 27. During that visit, Petitioner complained of fatigue since she had the flu, a diagnosis that was made during a visit on January 25, 2019. Id. Dr. Jamieson opined "[f]atigue is a non-specific symptom[] that is consistent with [Petitioner's] infection, and not indicative of worsening neuropathy." Id. Petitioner also complained of arm weakness on February 20, 2019, but Dr. Jamieson opined Petitioner did not specify the time of onset of the arm weakness. Id. at 21, 27. Thus, Dr. Jamieson placed onset of neurologic symptoms on February 20, 2019, 69 days or 10 weeks post-vaccination, as this was the first visit she reported neuropathic symptoms. Id. at 20-21, 27.

Dr. Jamieson disagreed with Dr. Tornatore's opinion that Petitioner's onset was January 24, 2019, or 42 days/six weeks post-vaccination as "[n]othing in the medical record supports this conclusion." Resp. Ex. A at 21; see also Resp. Ex. E at 6-7. Instead, Dr. Jamieson opined that

---

[65] Whether Petitioner had GBS or CIDP prior to vaccination does not affect the undersigned's Decision. Of note, however, Petitioner does not allege a significant aggravation claim.

onset occurred approximately February 20, 2019, when Petitioner complained of weakness and GBS-like symptoms. Resp. Ex. A at 20-21, 27. Dr. Jamison noted that on January 25, 2019, Petitioner sought treatment for the flu and a plantar wart, reporting a respiratory tract infection with one-day onset of myalgias, ear pressure, headache, nasal congestion, sinus pressure, and sneezing. Resp. Ex. E at 7. She showed signs and symptoms consistent with the flu, had a child with the flu, was diagnosed with the flu, and was treated for the flu, despite testing negative for flu A and B since such testing "is only about 67% sensitive." Id. (quoting Resp. Ex. 4 at 16-25). Dr. Jamieson noted this visit was unrelated to any neurologic symptoms. Id. She concluded that the contemporaneous medical records do not document neurologic complaints until February 20, 2019. Id. at 6-7.

Using February 20, 2019 places onset 69 days after vaccination, to which Dr Jamieson opined is too long to infer causation after vaccination, stating that Petitioner's increased neurological symptoms began "[b]eyond a time interval associated with which causation could be considered applicable." Resp. Ex. A at 21. Instead of vaccination, Dr. Jamieson opined that Petitioner's increased neuropathic symptoms in February 2019, were due to either Petitioner's CMT1A alone or in combination with CIDP. Id. at 26-27. Regardless, these symptoms occurred "past the time window for any consideration of a putative connection with her Tdap vaccination." Id.; see also Resp. Ex. E at 8 (opining "the increase in [Petitioner's] neurological symptoms occurred chronologically removed from her Tdap vaccination, remote from any time period used to propose causation").

### 3. Respondent's Expert, Dr. James N. Moy[66]

#### a. Background and Qualifications

Dr. Moy is a board-certified allergist/immunologist. Resp. Ex. C at 1; Resp. Ex. G at 2. He obtained his M.D. in 1984 from the University of Illinois College of Medicine, after which he completed a pediatrics residency at the University of Minnesota and an allergy/immunology fellowship at Rush-Presbyterian-St. Luke's Medical Center in Chicago. Resp. Ex. C at 1; Resp. Ex. G at 1. Since 1990, he has held various academic and faculty appointments at Rush University Medical Center in Chicago. Resp. Ex. C at 1; Resp. Ex. G at 1-2. He is currently an associate professor in the Departments of Immunology/Microbiology, Pediatrics, and Internal Medicine as well as the associate training program director for the allergy/immunology fellowship program. Resp. Ex. C at 1; Resp. Ex. G at 1-2. He was also the Chief of the Pediatric Allergy/Immunology Division at the John H. Stroger Hospital of Cook County in Chicago, Illinois for 25 years, from 1993 through 2018. Resp. Ex. C at 1. He is a named author in over 60 publications, though none specifically relate to AIDP, GBS, or CIDP. Id.; Resp. Ex. G at 8-14.

Since 1990, Dr. Moy has diagnosed and managed pediatric, adolescent, and young adult patients with autoimmune diseases and disorders. Resp. Ex. C at 1. He "do[es] not evaluate or manage patients with AIDP, GBS[,] or CIDP," and thus deferred to Dr. Jamieson on neurology-specific issues. Id. at 1-2. He focused his opinions on immunology and mechanisms that cause autoimmune diseases. Id. at 1.

---

[66] Dr. Moy provided two expert reports. Resp. Exs. C, F.

**b. Opinion**

**i. Althen Prong One**

Dr. Moy opined Dr. Tornatore did not provide "a reliable biological mechanism to show how the Tdap vaccine could have caused [] GBS" by "a preponderance of the evidence." Resp. Ex. C at 12; see also Resp. Ex. F at 4 ("Dr. Tornatore has presented no relevant or reliable evidence on how the Tdap vaccine can induce GBS (or any other neuropathy). He has not produced medical or scientific literature that the Tdap vaccine causes GBS, nor has he produced any evidence of a sound immunologic mechanism by which the Tdap vaccine can lead to the pathophysiology of GBS."). He asserted Dr. Tornatore's mechanism is "wholly speculative and unsupported" by the evidence. Resp. Ex. C at 12.

First, regarding Dr. Tornatore's molecular mimicry theory, Dr. Moy opined "cross-reactivity does not occur with vaccinations," and more specifically, that "there is no reliable scientific evidence that the Tdap vaccine induces molecular mimicry and that this process leads to autoimmune diseases in humans," including GBS. Resp. Ex. C at 7, 10. He did not dispute the theory of molecular mimicry generally, and he agreed that infections can cause autoimmune diseases via molecular mimicry. Id. However, he maintained infections and vaccines differ. Id. at 10-11 (citing, e.g., Resp. Ex. C-3 at 1 ("Theoretically, vaccines could trigger autoimmunity by means of . . . molecular mimicry . . . . There is strong evidence that [this] mechanism[] is [not] really effective in causing autoimmune diseases. Vaccines are not a source of autoimmune diseases. By contrast, absolute evidence exists that infectious agents can trigger autoimmune mechanisms and that they do cause autoimmune diseases.");[67] Resp. Ex. C-4 at 3 fig. 1 (depicting what occurs when an infection is at play in the pathogenesis of autoimmunity)).[68]

Dr. Moy also addressed Dr. Tornatore's sequence homology, opining Dr. Tornatore showed "partial sequence homology" involving only the primary structure of the proteins, but not the secondary and tertiary structures which he emphasized are also important. Resp. Ex. C at 11. Furthermore, Dr. Moy asserted that showing some homology does not mean that antibodies from one protein will necessarily bind to a second protein. Resp. Ex. F at 4 (citing Resp. Ex. F-1 at 5).[69]

He also took issue with Dr. Tornatore's reliance on papers focusing on the flu vaccine, explaining that each vaccine is "unique in its composition" and the immune system responds differently to these different compositions. Resp. Ex. C at 7. For example, the 1976-1977 flu

---

[67] M. De Martino et al., Vaccines and Autoimmunity, 26 Int'l J. Immunopathol. & Pharmacol. 283 (2013).

[68] Connie C. Qiu et al., Triggers of Autoimmunity: The Role of Bacterial Infections in the Extracellular Exposure of Lupus Nuclear Autoantigens, 10 Frontiers Immunol. 1 (2019).

[69] Cellular and Molecular Immunology (Abul K. Abbas et al. eds., 10th ed. 2022). Only one page of this book was provided.

vaccine contained flu A H1N1 viral antigens, whereas Tdap contains bacterial components. Id. He concluded that articles about the flu vaccine are therefore "not relevant" to this case. Id.; see also Resp. Ex. F at 1-2 (opining that "[b]ecause this case is regarding the Tdap vaccine and not [the] [flu] vaccine, the data regarding [flu] vaccines associated with GBS risk is not relevant to this case").

Dr. Moy added that other literature concerning vaccines other than Tdap, including those with tetanus-containing vaccines, are similarly not relevant here because they are made using different manufacturing processes and contain different ingredients. Resp. Ex. C at 8. He pointed out Dr. Tornatore did not provide evidence showing non-Tdap vaccines are comparable to the Tdap vaccine here, "or that the human immune system would respond similarly to each vaccine." Id.

Lastly, Dr. Moy took issue with a reliance on case reports because they "are not useful in establishing disease causation." Resp. Ex. C at 7-8 (citing Resp. Ex. C-1 at 1 (listing "major limitations" of case reports as "[l]ack of ability to generalize, no possibility to establish cause-effect relationship, danger of over-interpretation, publication bias, retrospective design, and distraction of reader when focusing on the unusual").[70] He opined that "without the comparison of risk between vaccinated and unvaccinated individuals, causation cannot be determined." Id. at 8. Along with case reports, Dr. Moy also opined limited case series are not reliable evidence to support causation. Id.

### ii. Althen Prongs Two and Three

Dr. Moy opined the Tdap vaccine did not cause Petitioner to develop GBS and that Dr. Tornatore did not provide preponderant evidence showing how Petitioner's Tdap vaccination caused her to develop GBS. Resp. Ex. F at 2, 4.

Dr. Moy briefly addressed Dr. Tornatore's opinions as to onset and, like Dr. Jamieson, disagreed with Dr. Tornatore. Resp. Ex. C at 12-13. Dr. Moy reviewed the record from January 25, 2019, which Dr. Tornatore relied upon when opining Petitioner's onset was January 24, 2019, and explained that there was no history of neurologic symptoms or abnormal neurologic findings documented at this visit. Id. Additionally, Dr. Moy opined Petitioner's fatigue on February 20, 2019 "would be a symptom of her respiratory illness." Id. at 13. Dr. Moy agreed with Dr. Jamieson that Petitioner first presented and complained of neurologic symptoms on February 20, 2019. Id. Thus, he concluded that the Tdap vaccination Petitioner received on December 13, 2018 did not cause GBS because onset was "a span of 69 days," which "does not comport with the theory presented by Dr. Tornatore." Id.

---

[70] Trygve Nissen & Rolf Wynn, The Clinical Case Report: A Review of Its Merits and Limitations, 7 BMC Rsch. Notes 1 (2014).

# III. DISCUSSION

## A. Standards for Adjudication

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

In particular, Petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface v. Sec'y of Health & Hum. Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); see also Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. Shyface, 165 F.3d at 1351. A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case." Flores v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 157, 162-63 (2014); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); Pafford, 451 F.3d at 1358-59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

### B. Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But see Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))), recons. den'd after remand, 105 Fed. Cl. 353 (2012), aff'd mem., 503 F. App'x 952 (Fed. Cir. 2013).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley, 991 F.2d at 1575.

Despite the weight afforded to medical records, special masters are not rigidly bound by those records in determining onset of a petitioner's symptoms. Valenzuela v. Sec'y of Health & Hum. Servs., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (noting Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them").

### C. Causation

To receive compensation through the Program, Petitioner must prove either (1) that she suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that she received, or (2) that she suffered an injury that was actually caused by a vaccination. See §§ 11(c)(1), 13(a)(1)(A); Capizzano, 440 F.3d at 1319-20. Petitioner must

show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface, 165 F.3d at 1352-53).

Because Petitioner does not allege she suffered a Table Injury, she must prove a vaccine she received caused her injury. To do so, Petitioner must establish, by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen, 418 F.3d at 1278.

The causation theory must relate to the injury alleged. Petitioner must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d. 543, 548-49 (Fed. Cir. 1994). Petitioner cannot establish entitlement to compensation based solely on her assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). In determining whether a petitioner is entitled to compensation, the special master shall consider all material in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation." § 13(b)(1)(A). The undersigned must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in Petitioner's favor when the evidence weighs in her favor. See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); Althen, 418 F.3d at 1280 (noting that "close calls" are resolved in Petitioner's favor).

Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred. See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 573-74 (2015) (denying Petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard). The Federal Circuit has made clear that the mere possibility of a link between a vaccination and a petitioner's injury is not sufficient to satisfy the preponderance standard. Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by a preponderance of the evidence); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359-60 (Fed. Cir. 2019). While certainty is by no means required, a possible mechanism does not rise to the level of preponderance. Moberly, 592 F.3d at 1322; see also de Bazan, 539 F.3d at 1351.

## IV. DIAGNOSIS ANALYSIS

As Federal Circuit precedent establishes, in certain cases it is appropriate to determine the nature of an injury before engaging in the Althen analysis. Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010). Since "each prong of the Althen test is decided relative to the injury[,]" determining facts relating to the claimed injury can be significant in a case where diagnosis is not clear. Id. Here, the parties dispute diagnosis, and so it is appropriate to first resolve that issue.

For the reasons discussed below, the undersigned finds Petitioner had both CIDP and CMT1A.

The primary reason for this finding is that it is consistent with the opinions of Petitioner's treating physicians.

On February 20, 2019, when Petitioner described her symptoms as "GBS like," PA Martin assessed Petitioner with GBS/CIDP and educated Petitioner on CIDP. Pet. Ex. 5 at 1571-73. On March 28, 2019, Petitioner saw PA Martin and reported that IVIG "did not help" and that her "weakness [wa]s worse." Id. at 1443. PA Martin updated his assessment to "worsening" GBS/CIDP "despite recent IVIG," and he noted Petitioner's "etiology seem[ed] consistent with CIDP given [the] lack of patellar reflexes." Id. at 1442. By April 2019, PA Martin updated Petitioner's diagnosis to only CIDP.

Petitioner also saw Dr. Oligmueller during this time. At a follow-up visit with Dr. Oligmueller on March 25, 2019, Dr. Oligmueller advised Petitioner to continue care with her neurologist for her CIDP. Pet. Ex. 5 at 1470-71. Dr. Oligmueller continued to refer to Petitioner's condition as CIDP. See, e.g., id. at 446.

The third treating physician is neurologist, Dr. Strader, whom Petitioner established care with on March 29, 2019. At the first visit, Petitioner recounted her prior history of GBS in 2008 and 2012. Dr. Strader "discussed with [Petitioner] that CIDP [was] a possibility," as was always the case when "a diagnosis of possible recurrent GBS is entertained." Pet. Ex. 5 at 1414. He also noted, however, that "some of [Petitioner's] symptoms, as well as findings on [examination], could potentially suggest an inherited neuropathy," and he ordered genetic testing. Id.

Dr. Strader reviewed recent MRIs and CSF results on April 8, 2019 and opined Petitioner's results "d[id] in fact look most like CIDP." Pet. Ex. 5 at 1357. He opined Petitioner's cervical spine MRI and CSF exhibited findings seen in CIDP. He ordered a three-day steroid course, which he noted could be "helpful in CIDP" but "counterproductive in the early stages of [GBS]." Id. at 1357-58. Petitioner's improvement on steroids was short-lived and she began plasmapheresis. Petitioner attended a renal evaluation as part of the monitoring for her plasmapheresis treatment, and the renal specialist's assessment included CIDP. Id. at 1110-11.

On May 23, 2019, Petitioner presented to Dr. Strader for an EMG/NCS, which showed "a severe sensorimotor polyneuropathy that [was] primarily demyelinating in nature, with demyelination likely acquired." Pet. Ex. 5 at 1045. This would be more consistent with CIDP than CMT due to the "likely acquired" nature of the findings. But see Pet. Ex. 5 at 233-35 (repeat EMG/NCS from November 20, 2019 indicating "homogeneity of the conduction velocity slowing and absence of acquired demyelinating features (notable asym[m]etry, partial conduction block[,] or temporal dispersion) argue[d] against a coexisting acquired inflammatory demyelinating polyneuropathy, though [did] not fully exclude it").

Petitioner returned to Dr. Strader on July 5, 2019 and learned her genetic results were consistent with CMT1A, though her EMG/NCS and CSF were "more suggestive of an acquired demyelinating neuropathy." Pet. Ex. 5 at 896-97. On October 3, 2019, Dr. Strader characterized Petitioner's condition as a "demyelinating neuropathy, with clinical, laboratory, and electrodiagnostic features of [CMT] disease as well as an acquired demyelinating neuropathy such as CIDP." Id. at 380, 386. And at a visit on January 21, 2021, Dr. Strader wrote, Petitioner had a "[d]emyelinating peripheral neuropathy with what appear[ed] to be both genetic and acquired features." Id. at 26. Dr. Strader diagnosed Petitioner with CIDP and CMT.

Lastly, Petitioner saw neuromuscular specialist Dr. Fridman. On October 24, 2019, Dr. Fridman reviewed Petitioner's history and prior workup and explained that "while some of the clinical features [were] in keeping with her known diagnosis of [CMT1A], the intermittent exacerbations, [CSF] profile[,] and degree of nerve root enhancement certainly suggest[ed] the possibility of a super-imposed inflammatory neuropathy." Pet. Ex. 5 at 325-27. Dr. Fridman ordered a repeat EMG/NCS, concluded that "[t]he homogeneity of the conduction velocity slowing and absence of acquired demyelinating features (notable asym[m]etry, partial conduction block[,] or temporal dispersion) argue[d] against a coexisting acquired inflammatory demyelinating polyneuropathy, though [did] not fully exclude it." Id. at 233-35. In a follow-up on May 28, 2020, Dr. Fridman opined that "it remain[ed] unclear how much (if at all) a superimposed inflammatory neuropathy [was] affecting [Petitioner's] symptoms at this time," though "[c]ertainly [Petitioner's] prior [CSF] profile and degree of nerve root enhancement suggest[ed] the possibility of a super-imposed inflammatory neuropathy." Pet. Ex. 5 at 139-40 (further noting an inherited disease "would still not explain the inflammatory profile on [Petitioner's] CSF"). Thus, Dr. Fridman believed that Petitioner had CMT and an inflammatory neuropathy, consistent with CIDP.

Regarding Petitioner's diagnosis of CMT, this relates to her underlying genetic/inherited illness suspected by Dr. Strader in 2019 and later confirmed by genetic testing. Her inherited illness was not caused by vaccination. Thus, she had an inherited neuropathy (CMT1A) with a superimposed inflammatory neuropathy (CIDP).

Overall, Petitioner's treating physicians post-vaccination diagnosed her with CIDP or CIDP and CMT. The treating physician post-vaccination assessments of GBS were later dropped and/or changed to CIDP.

The undersigned gives weight to the statements of Petitioner's treating physicians as they are "in the best position" to determine Petitioner's injury. See Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326; Cucuras, 993 F.2d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence").

Further, Dr. Tornatore did not provide a reasoned explanation for his opinion that Petitioner's diagnosis was GBS. He did not acknowledge the fact that Petitioner's treating physicians reached a different diagnosis of CIDP, or explain why he disagreed with a diagnosis of CIDP. He also did not disagree that Petitioner had CMT.

In conclusion, the weight of the evidence shows that the Petitioner's relevant diagnoses were CIDP and CMT, and not GBS. However, the undersigned's Decision here does not turn on Petitioner's diagnosis. Even assuming Petitioner's diagnosis was GBS, there is not preponderant evidence of an appropriate temporal association between vaccination and onset of her inflammatory demyelinating condition to attribute it to vaccination.

## V. ONSET ANALYSIS

The experts and parties disagree as to the onset of Petitioner's neurological symptoms and thus, onset is disputed. The undersigned finds, by a preponderance of the evidence, Petitioner's neurological symptoms post-vaccination did not begin until approximately February 20, 2019, or 69 days after her vaccination, when Petitioner reported arm weakness.

This onset date is consistent with Petitioner's contemporaneous medical records. On December 13, 2018, Petitioner received a Tdap vaccination. One month later, on January 15, 2019, Petitioner saw a treating physician for pain in her neck and arm following a MVA. Neurological symptoms were not reported or documented at this visit.

On January 25, 2019, 43 days post-vaccination, Petitioner saw a provider for flu-like symptoms. Her child had tested positive for the flu the week prior to the visit. Petitioner was diagnosed with and treated for the flu. No neurological symptoms were reported during this visit or noted on examination.

On February 20, 2019, 69 days post-vaccination, Petitioner returned to PA Martin with a chief complaint of "[follow up] for arm weakness, recent MVA." Pet. Ex. 5 at 1571, 1573. She explained "since she had the flu, she [had been] feeling tired all over" and "[s]he [was] having weakness in her arms." Id. at 1573. This was the first report of neurological symptoms following her December 13, 2018 Tdap vaccination.

In reaching his opinion that Petitioner's onset was between three weeks and 42 days/six weeks, Dr. Tornatore first relies upon Petitioner's affidavit, which reported symptom onset within three weeks of her December 2018 Tdap vaccination. Petitioner's affidavit was executed on June 6, 2022, several years after the events in question and after she filed her petition. In her affidavit, Petitioner averred that she received a Tdap vaccine on December 13, 2018, and "[w]ithin three weeks[,] [she] began feeling pain and tingling in [her] extremities." Pet. Ex. 7 at ¶¶ 3-4.

The undersigned finds this affidavit less persuasive than the contemporaneous medical records as it was made later-in-time and for litigation. See, e.g., Cucuras, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); Vergara ex rel. J.A.V. v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); Campbell, 69 Fed. Cl. at 779 ("It is, of course, true that where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation

more weight."); Ricci v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 385, 391 (2011) ("Medical records from years later, merely chronicling a timeline between vaccination and injury, are not worthy of the same consideration as contemporaneous records."); Rote v. Sec'y of Health & Hum. Servs., No. 90-036V, 1992 WL 165970, *5 (Cl. Ct. Spec. Mstr. July 1, 1992) (finding the lay witness testimony insufficient to overcome the weight of the contemporaneous medical records); see also Zumwalt v. Sec'y of Health & Hum. Servs., No. 16-994V, 2019 WL 1953739, at *19 (Fed. Cl. Spec. Mstr. Mar. 21, 2019) (rejecting opinion from a treating provider when he presented an opinion two-and-one-half years after treatment and after litigation was initiated), mot. for rev. den'd, 146 Fed. Cl. 525 (2019).

Next, Dr. Tornatore cites to Petitioner's radiating pain from her neck to arms reported on January 15, 2019. He failed to recognize Petitioner's pain was attributed to her recent MVA. He acknowledged Petitioner did not report loss of sensation or bowel or bladder dysfunction. He did not explain, however, how this record could be evidence of a neurologic condition such as GBS or CIDP.

As to Dr. Tornatore's maximum of 42-day/six-week onset, he cites to Petitioner's medical records from January 25 and February 20, 2019. On January 25, Petitioner reported a one-day history of myalgias and upper respiratory symptoms. Petitioner was diagnosed with and treated for the flu. Neurologic symptoms were not reported or documented at this visit. Dr. Tornatore does not explain how upper respiratory symptoms and/or the flu are manifestations of GBS or CIDP. Nor does he address the lack of neurological symptoms at this visit.

Dr. Tornatore opined that at the February 20, 2019 visit, Petitioner related her symptoms, which she characterized as "GBS like," to her recent flu infection in January 2019. However, a plain reading of this record does not support Dr. Tornatore's contention. The history of present illness from this visit documents "[Petitioner] said she had the flu recently. Since then[,] she is feeling tired all over. She is having weakness in her arms. . . . She says her symptoms feel like GBS like." Pet. Ex. 5 at 1573. Petitioner related her fatigue to her recent flu infection, diagnosed on January 25, 2019. However, Dr. Tornatore does not provide an explanation for why fatigue was the initial manifestation of Petitioner's neurologic condition, nor does he provide evidence as to why fatigue was not consistent with the flu as Dr. Jamieson contends.

The arm weakness reported on February 20, 2019, unlike the fatigue, is not related back to Petitioner's flu infection by Petitioner or her treating physician. Arm weakness and Petitioner's report of GBS like symptoms, coupled with the lack of neurologic complaints at her visits on January 15 and January 25, establishes preponderant evidence of onset on February 20, 2019. The undersigned does not find preponderant evidence of onset prior to February 20, 2019, and does not find that Petitioner experienced neurologic symptoms three to six weeks post-vaccination.

In conclusion, the undersigned finds by preponderant evidence that the onset of Petitioner's neurological symptoms of weakness in her arms reported February 20, 2019 was the initial manifestation of her neurologic condition/CIDP.

## VI. CAUSATION ANALYSIS

### A. Althen Prong One

Under Althen prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury. Andreu, 569 F.3d at 1375; Pafford, 451 F.3d at 1355-56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. Boatmon, 941 F.3d at 1359; see also Knudsen, 35 F.3d at 548; Veryzer v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"). If Petitioner relies upon a medical opinion to support his theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. See Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1347 (Fed. Cir. 2010) ("The special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories."); Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing Fehrs v. United States, 620 F.2d 255, 265 (Ct. Cl. 1980))).

The experts dispute whether the Tdap vaccine can cause GBS or CIDP via molecular mimicry.

Due to the facts and circumstances of this case, specifically the fact that there were several potential causative agents prior to onset and because onset was 69 days post-vaccination, the undersigned's determination as to causation turns on an analysis of Althen Prong Two and Althen Prong Three. Assuming that Petitioner has proven a sound and reliable causal mechanism under Althen Prong One, the undersigned finds Petitioner did not provide preponderant evidence of a logical sequence of cause and effect under Althen Prong Two and did not provide preponderant evidence of a medically acceptable timeframe under Althen Prong Three. Thus, the undersigned turns her focus to Althen Prong Two and Althen Prong Three. See Vaughan ex rel. A.H. v. Sec'y of Health & Hum. Servs., 107 Fed. Cl. 212, 221-22 (2012) (finding the special master's failure to rule on Althen prong one not fatal to his decision because Althen prong two was fatal to petitioner's case); Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d 1355, 1364 (Fed. Cir. 2012) ("discern[ing] no error in the manner in which the special master chose to address the Althen [prongs]" when he focused on Althen prong two after "assuming the medical viability of [the] theory of causation").

### B. Althen Prong Two

Under Althen prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" Pafford, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. Cucuras, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano, 440 F.3d at 1325. Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

The undersigned finds Petitioner failed to provide preponderant evidence that there is a logical sequence of cause and effect showing Petitioner's Tdap vaccine caused her to develop GBS, CIDP, or any other injury.[71]

First, Petitioner's clinical course was not consistent with the theory of molecular mimicry, or any other theory offered, due to the long onset period of 69 days, which is more than eight weeks. See, e.g., Ray v. Sec'y of Health & Hum. Servs., No. 20-321V, 2025 WL 3900631, at *22-27 (Fed. Cl. Spec. Mstr. Dec. 12, 2025) (detailing numerous reasons why an onset of 74 days was not appropriate in a GBS/CIDP case and citing relevant case law); Kindle v. Sec'y of Health & Hum. Servs., 177 Fed. Cl. 689, 712 (2025) (finding "[t]he Chief Special Master properly concluded that Petitioner had not proven his off-Table claim because the nine-week delay from Petitioner's vaccination to his symptom onset [was] too lengthy to be considered medically acceptable to infer causation-in-fact" (internal quotations omitted)); Barone, 2014 WL 6834557, at *13 (noting eight weeks/two months is the longest reasonable timeframe for a flu/GBS injury); De La Cruz v. Sec'y of Health & Hum. Servs., No. 17-783V, 2018 WL 945834, at *1 (Fed. Cl. Spec. Mstr. Jan. 23, 2013) (finding an onset of GBS more than two months after flu vaccination not compensable); Chinea v. Sec'y of Health & Human Servs., No. 15-095V, 2019 WL 1873322, at *32-33 (Fed. Cl. Spec. Mstr. Mar. 15, 2019) (finding a GBS onset of eleven to twelve weeks after vaccination was beyond the six- to eight-week medically appropriate timeframe for the occurrence of vaccine-induced GBS), mot. for rev. denied, 144 Fed. Cl. 378 (2019); Aguayo v. Sec'y of Health & Hum. Servs., No. 12-563V, 2013 WL 441013, at *3 (Fed. Cl. Spec. Mstr. Jan. 15, 2013) (rejecting an onset of three-and-one-half months in a flu/GBS case); Corder v. Sec'y of Health & Hum. Servs., No. 08-228V, 2011 WL 2469736, at *27-29 (Fed. Cl. Spec. Mstr. May 31, 2011) (finding petitioner failed to prove that the flu vaccine can cause GBS four months after vaccination).

Additionally, case law and medical literature does not support an onset greater than eight weeks. See infra Section VI.C.

[71] Throughout the remainder of the undersigned's analysis, the undersigned refers to Petitioner's alleged injury as "GBS/CIDP" or "GBS, CIDP, or any other injury" to incorporate all of the expert opinions.

Second, Petitioner's treating physicians did not offer opinions associating her condition with her vaccination. In cases with such evidence, it can be considered in an analysis of Althen prong two. See Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen, 418 F.3d at 1280)).

Petitioner's contemporaneous medical records show that Petitioner's treating physicians attributed her condition to her recent flu illness. On February 20, 2019, at her first visit post-vaccination that documented neurologic complaints, assessment from PA Martin was GBS/CIDP "after [Petitioner] recently had [the] flu." Pet. Ex. 5 at 1571-72. At a follow-up visit on March 28, 2019, PA Martin's assessment noted "worsening" GBS/CIDP "despite recent IVIG after [Petitioner] recently had [the] flu." Id. at 1442. On March 29, 2019, at her first visit with neurologist Dr. Strader, Petitioner reported an infectious illness in January 2019. And since then, she "ha[d] been having significant neurologic symptoms that [we]re reminiscent of symptoms prior to her [two] episodes diagnosed as [GBS]." Id. at 1415.

Petitioner did not associate her symptoms to her December 2018 Tdap vaccination until July 13, 2019, seven months later. See Pet. Ex. 5 at 799. Her provider during that visit did not opine her condition was due to the Tdap vaccination.

Third, regarding alternative causes, the undersigned acknowledges that Petitioner is not required to eliminate other potential causes in order to be entitled to compensation. See Walther v. Sec'y of Health & Hum. Servs., 485 F.3d 1146, 1149-52 (Fed. Cir. 2007) (finding petitioner does not bear the burden of eliminating alternative independent potential causes). However, it is reasonable to consider "evidence of other possible sources of injury" in determining "whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question." Stone, 676 F.3d at 1379; see also Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 963 (Fed. Cir. 2023) ("Such contemplation of a potential causative agent when evaluating whether or not a petitioner has established a prima facie case is in accordance with the law."); Flores, 115 Fed. Cl. at 162-63 ("[T]he special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case.").

Here, the record indicates a possible alternative cause: a flu infection beginning approximately January 24, 2019. Petitioner's expert acknowledges this illness in his summary of Petitioner's medical records but does not otherwise discuss or address it. Although Respondent's experts did not hold this opinion to a preponderant evidence standard, the undersigned finds it relevant to consider "evidence of other possible sources of injury" in determining "whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question." Stone, 676 F.3d at 1379. Thus, the undersigned considers evidence relating to whether Petitioner suffered from the flu, as well as the likelihood that said illness triggered Petitioner's condition, as "[s]uch contemplation of a potential causative agent when evaluating whether or not a petitioner has established a prima facie case is in accordance with the law." Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 963 (Fed. Cir. 2023); see also Flores,

115 Fed. Cl. at 162-63 ("[T]he special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case.").

Here, both Dr. Tornatore and Dr. Jamieson note infections, including the flu or flu-like illnesses, can precede GBS/CIDP. See Pet. Ex. 18 at 25; Resp. Ex. A at 16, 25. Both Dr. Tornatore and Dr. Jamieson cite literature documenting cases of GBS with preceding infections, including flu or flu-like illnesses. See, e.g., Pet. Ex. 24 at 3 (noting that of the 2,090 VAERS reports examined, 10 reports were of GBS following Tdap vaccination, and three of the 10 also reported pre-vaccination history of upper respiratory infection or flu-like illnesses).

Additionally, Petitioner's own treating physician, Dr. Oligmueller, opined that although the rapid flu tests were negative, they are "only about 67% sensitive," and because Petitioner and her daughter had "very common" flu symptoms, he treated and diagnosed Petitioner with the flu. Pet. Ex. 5 at 1592, 1595-97, 1599. The undersigned gives greater weight to the statements of Petitioner's treating physicians as they are "in the best position" to determine Petitioner's injury. See Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326; Cucuras, 993 F.2d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence").

Lastly, the undersigned finds it informative that Petitioner's original episode of GBS in 2008 was preceded by a two-week history of a flu-like illness and neither her 2008 nor 2012 GBS diagnoses were temporally related to a Tdap, tetanus-containing, or diphtheria-containing vaccination. See Pet. Ex. 10 at 90.

Accordingly, the undersigned finds that Petitioner has not satisfied her burden under Althen prong two.

### C. Althen Prong Three

Althen prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. Althen, 418 F.3d at 1281. That term has been defined as a "medically acceptable temporal relationship." Id. The Petitioner must offer "preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." de Bazan, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also be consistent with the theory of how the relevant vaccine can cause the injury alleged (under Althen prong one). Id.; Koehn, 773 F.3d at 1243; Shapiro, 101 Fed. Cl. at 542; see Pafford, 451 F.3d at 1358.

As discussed above, the undersigned found onset to be approximately February 20, 2019, 69 days post-vaccination based on the most contemporaneous-in-time medical records.

Dr. Tornatore provided no evidence to show that an onset of 69 days or approximately ten weeks was appropriate.

Additionally, the undersigned finds the case law does not support an onset of 69 days, which is almost 10 weeks. See, e.g., Ray, 2025 WL 3900631, at *22-27 (detailing numerous

reasons why an onset of 74 days was not appropriate in a GBS/CIDP case and citing relevant case law); Barone, 2014 WL 6834557, at *13 (noting eight weeks/two months is the longest reasonable timeframe for a flu/GBS injury); Kindle, 177 Fed. Cl. at 712 (agreeing a "nine-week delay from Petitioner's vaccination to his symptom onset [was] too lengthy to be considered medically acceptable to infer causation-in-fact" (internal quotations omitted)); Jones ex rel. Boon v. Sec'y of Health & Hum. Servs., No. 19-788V, 2025 WL 2045820, at *22 (Fed. Cl. Spec. Mstr. June 24, 2025) (finding "an onset of 94 days or over three months after flu vaccination [] wholly unsupported by the medical literature," regardless of whether the petitioner suffered GBS or CIDP); Chinea, 2019 WL 1873322, at *32-33 (finding a GBS onset of eleven to twelve weeks post-vaccination not medically appropriate); De La Cruz, 2018 WL 945834, at *1 (finding an onset of GBS more than two months after flu vaccination not compensable).

Although decisions of other special masters are not binding, the undersigned finds these cases instructive. See Boatmon, 941 F.3d at 1358; Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

In Kindle, the Chief Special Master found the record supported a GBS onset no earlier than 65 days post-vaccination, which was "too lengthy" and "too remote" to be medically acceptable. Kindle v. Sec'y of Health & Hum. Servs., No. 20-1423V, 2025 WL 603690, at *8 (Fed. Cl. Spec. Mstr. Jan. 21, 2025). For support, the Chief Special Master noted the longest timeframe generally accepted for similar non-Table claims was eight weeks (two months). Id.

On review, the Court of Federal Claims found "[t]he Chief Special Master properly concluded that Petitioner had not proven his off-Table claim because the nine-week delay from Petitioner's vaccination to his symptom onset [was] too lengthy to be considered medically acceptable to infer causation-in-fact." Kindle, 177 Fed. Cl. at 712. Judge Roumel explained the Chief Special Master's conclusion was not arbitrary and capricious for numerous reasons. Id. at 712-16. First, Judge Roumel found it was "permissible and reasonable for the Chief Special Master to rely on his own 'accumulated expertise,' as well as that of other special masters" in declining a more than eight-week delay in onset supportive of causation. Id. at 713.

Judge Roumel also cited numerous cases to support eight weeks/two months as the "longest timeframe . . . generally accepted" for non-Table GBS cases and noted "[t]he Court is not aware of any case in which a special master recognized an onset of longer than 60 days post-vaccination." Kindle, 177 Fed. Cl. at 712-13, 713 n.23 (citing Redzepagic v. Sec'y of Health & Hum. Servs., No. 19-853V, 2025 WL 1147520, at *16 (Fed. Cl. Spec. Mstr. Mar. 19, 2025) ("Decisions in the Vaccine Program have gone out as far as two months or 60 days for vaccine-caused demyelinating illness."); Cooper v. Sec'y of Health & Hum. Servs., No. 18-1885V, 2024 WL 1522331, at *18-20 (Fed. Cl. Spec. Mstr. Mar. 12, 2024) (noting that a 60-day onset is "on the very edge of the entirely undisputed eight-week latency period")).

Along with relying on his expertise, Judge Roumel noted the Chief Special Master also relied upon the medical literature in concluding a nine-week onset was not medically acceptable, and none of the literature supported an onset of vaccine-induced GBS beyond the generally accepted eight-week interval. Kindle, 177 Fed. Cl. at 713-14.

Additionally, Judge Roumel determined "[t]he Chief Special Master did not impermissibly impose a "hard and fast deadline . . . between vaccination and the onset of clinically apparent symptoms of neurologic injury." Kindle, 177 Fed. Cl. at 714-15 (quoting Paluck v. Sec'y of Health & Hum. Servs., 786 F.3d 1373, 1383 (Fed. Cir. 2015)). Judge Roumel explained that

> Petitioner failed to proffer any persuasive evidence—in the form of medical literature or otherwise—which could preponderantly prove that his GBS onset occurred within a medically acceptable timeframe to infer vaccine causation. Absent such preponderant evidence supporting that—based on Petitioner's specific circumstances—a longer timeframe is appropriate, it was reasonable for the Chief Special Master to conclude that the timing prong of Althen had not been met.

Id. at 715. Thus, Judge Roumel determined the Chief Special Master appropriately concluded that a nine-week (or 65-day) onset of GBS was not medically acceptable under Althen prong three, and therefore, the petitioner's failure to meet this prong was dispositive of his case. Id. at 715-16. The undersigned agrees with Judge Roumel and finds the reasoning in Kindle persuasive.

Additionally, here, like in Kindle, "Petitioner failed to proffer any persuasive evidence—in the form of medical literature or otherwise—which could preponderantly prove that [her] [] onset occurred within a medically acceptable timeframe to infer vaccine causation." Kindle, 177 Fed. Cl. at 715. Overall, Dr. Tornatore's literature discussing GBS/CIDP following a tetanus infection or a tetanus-containing vaccine reports an onset period up to 56 days.

For the tetanus infection, Lee et al. reported two patients who had GBS following a tetanus infection with onset periods of eight and 23 days after infection.[72]

For tetanus-containing vaccines, Top et al. described 24 "[p]ostvaccine" patients who developed GBS following a vaccination; onset occurred within four to 30 days (median: 18 days) post-vaccination. And of these 24 patients, nine received a tetanus-containing vaccine. The cases with an onset greater than 30 days were referred to as "[n]onvaccine-associated" cases. Pet. Ex. 32 at 2. Chang et al. noted a median onset of 25 days (range: 1-56 days) in 10 GBS post-Tdap vaccine cases. One patient in Hughes et al. developed GBS two weeks after a tetanus vaccination, and experienced recurrences two additional instances following future tetanus vaccinations. Newton and Janati reported a case of GBS nine days post-tetanus vaccination. Bakshi and Graves reported a patient who developed GBS four days after a tetanus-diphtheria vaccination, In Ammar, the patient developed GBS one and a half weeks after Tdap vaccination. And the patient in Pollard and Selby reported onset periods of three weeks, two weeks, and 10 days.

---

[72] Of note, Dr. Tornatore did not explain how an association between the wild tetanus infection and GBS could be extrapolated to the Tdap vaccine, which contains an inactive form of tetanus.

In summary, there is a lack of evidence to establish that an onset of GBS/CIDP occurring 69 days after vaccination is medically appropriate, and an onset of 69 days is too long to be explained by any sound or reliable medical theory of causation, including molecular mimicry. Therefore, the undersigned finds Petitioner has failed to provide preponderant evidence with respect to Althen prong three.

## VII. CONCLUSION

The undersigned extends her sympathy to Petitioner for all that she has suffered. Her Decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

For the reasons discussed above, the undersigned finds that Petitioner has failed to establish by preponderant evidence that the Tdap vaccination she received caused her to develop GBS, CIDP, or any other injury. Therefore, Petitioner is not entitled to compensation and the petition must be dismissed.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master